## Napier v. Commonwealth.

(Decided May 11, 1937.)

D. HOLLENDER HALL and J. C. BURNETTE for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Reversing.

Beckham Napier was indicted, tried, and convicted in the Knott circuit court on the 26th day of August, 1936, for the willful murder of Andrew Patrick, and his punishment fixed at death. He appeals from that judgment

First, it is insisted that the court committed an error in forcing him to trial on the 28th day of August, 1936, which was but four days after the indictment was returned against him. Second, that he did not get a fair trial, because one of the jurors that tried him had formed and had a fixed opinion as to his guilt or innocence sufficient to disqualify him. Third, the same juror was charged with being related to the deceased, which would disqualify him as a juror. Fourth, the Commonwealth's attorney and the attorney for the prosecution were guilty of such misconduct in their argument that the defendant did not get a fair and impartial trial.

We find it unnecessary to consider either of the grounds, except the last one referred to, as we have concluded the case will have to be reversed, by reason of the misconduct of the Commonwealth's attorney, in

his argument to the jury. The other alleged errors may never be made on another trial; therefore, it is useless and a waste of time to consider either of them.

This homicide occurred in Knott county, Ky., on what is known as the big branch of Ball's fork, on the 23rd of July, 1936. The deceased and the appellant knew each other well and lived within a mile and a half of each other. On the morning of the 23rd of July, 1936, the evidence is to the effect that Andrew Patrick was at his home and on account of the feeble condition of his wife was washing dishes in the kitchen, when appellant came to his front gate and asked the wife of the deceased if her husband was at home and whether he could see him. She at once called her husband and he left his dishwashing and went out of the gate where Napier was; Napier at the time was under the influence of intoxicants; had a bottle in his pocket. It was about 5 or 6 o'clock in the evening. The wife of the deceased was sitting in a swing in the yard. Her son was sitting on the baluster of the porch. When appellant asked where the deceased was, the wife told him he was in the kitchen washing dishes. He said: "Tell him to come out, I want to see him." When her husband came out, he invited Napier to come in, but Napier's answer was: "No, I want to see you." They then together walked across the branch close to the house. Napier then pulled his pistol from his pocket, shot Patrick in the breast; he (Patrick) staggered back and Napier shot him twice more. They were in 40 or 50 yards of the house when the shooting occurred; in fair view to the wife and son of the deceased. When Andrew Patrick left the house, he had no gun, "not even a pocket knife"; he was walking a little behind Napier; they were talking. It was not known what was said. Lillian Patrick, the deceased's wife, who saw the shooting, went to her husband after he had fallen. When she arrived, he was dead, and never moved after he struck the ground. She saw Napier with a pistol in his hand, standing close by the body. Napier then walked away slowly and left. There were three shots fired. Her husband was shot three times. On the trial the clothing was exhibited, showing where the bullets entered his body. No one witnessed the shooting except Lillian Patrick and her son, Charlie Patrick. It was further in evidence by the witness, Ishmael Brewer, a boy about fourteen years of age,

that a short time before the shooting, about 4:30 or 5 o'clock in the evening of the same day, he saw Napier, who was on his way toward the home of the deceased, Patrick. He stopped at the home of Monroe Wootens, about a mile from the home of Andrew Patrick; had a talk with Wootens; heard Napier say he would not be there long, but did not hear him call the name of Patrick. He looked at the witness when he said he would not be there long. At the time Napier was drunk. He had a pistol and a half pint of liquor in his pocket. No one was present except himself and Wootens. He had not been there long, not over five minutes, when Napier came to Wootens. He had known Napier for some time. Napier at the time was cursing and "acting like a drunken man." Charlie Patrick, the son of the deceased, stated in substance that he saw Napier when he shot and killed his father; heard him ask his father to come out and heard him tell his father that he wanted to see him a minute; saw the deceased walk down across the branch, following Napier, talking to him, but he could not hear what they said; saw Napier shoot his father three times. When he did so, his father was doing nothing except walking along behind him. His father had no weapon of any kind. Napier had his pistol in his right pocket, but he did not know what kind of pistol it was, "except it was blue." As soon as his father was shot, he at once went after Princess Short and Grover Patrick. No one saw the shooting except his mother and himself; that he saw his clothes searched; there were not any weapons on his father's person, nor did he have any. On cross-examination, he said he saw Nancy Prater search his father and found nothing except some tobacco. At the time his father was shot, his hands were down by his side. He made no effort to get a knife, "or to do anything." Lawrence Patrick stated that on the evening of the day Andrew Patrick was killed, Napier went down by his house and stopped at his place, called him out to the gate, made inquiry of him if he knew where Andrew Patrick was; told him at the time that he was going to kill him. After telling him that, he went on down toward the branch where Andrew Patrick lived. He had a pistol on him and a bottle. He also mentioned a man by the name of Joe Daniels. When he inquired of him where Andrew Patrick was, he told him he was not at home. Napier then said he had been robbed. In a short time after

Napier passed his house, he learned of the killing of Andrew Patrick; went to him and found him "over in the bottom" about 45 or 50 yards from his home. His body was in plain view of the house where Andrew Patrick lived and where Lillian Patrick and her son were at the time of the killing. Henry Amburgy stated that on the evening before Andrew Patrick was killed, he was at his home chopping up stove wood when Napier came to his house. He asked him if he had seen Andrew Patrick and Joe Daniels, told him that they took from him $18.60; that "one of us is going to separate from Big Branch"; no one was present at the time, except Napier and himself. He had known Napier for three or four years. There was other evidence offered by the Commonwealth that is important to be related.

Beckham Napier, in his own behalf, admitted the killing; claimed that it was done in self-defense; claimed that some time before the killing Andrew Patrick, together with Joe Daniels, about 400 or 500 yards from his home, and before daylight, when he was going to his job, robbed him and took from him $17.50; that his purpose on this occasion in inquiring for him, as he left his home and passed the homes of the witnesses that testified against him, was to find out whether Patrick was at home, so he could have him arrested; that he had left his home that morning and was going to his father's to borrow a mule to go to town to get a warrant for Patrick for robbing him. He had to pass the home of the deceased. There was no other way to go. He stopped at Monroe Wootens' because he saw a man that he thought was Andrew Patrick, but it turned out not to be; denied having any conversation with Wootens in the presence or hearing of Ishmael Brewer; denied that he asked Wootens if Andrew Patrick was in his house; that he then went to one Lawrence Patrick, denied having any conversation with him, and denied having any conversation with Grover Patrick or any one else; stated that when he went to Andrew Patrick's home he was coming out of his gate; at that time he was two or three steps in front of the gate and Andrew Patrick asked him where he was going and he told him he was "going to his Dad's"; had not told any one up to that time, except his wife, that he had been robbed. When he passed the house of Andrew Patrick, Patrick

asked him if he thought he got his money. In answer he told him: "I know you got it." Also, told him that "if he would give him as much as $10.00 back, he would not tell it." Andrew Patrick told him he would give him nothing and then snapped his pistol three times at him before he shot; stated that he shot Patrick three times and shot him after he fell down on the ground when he had his pistol by his side. He then went away. The testimony of Napier as to what occurred at the killing was all of his evidence as to what occurred there. There was other evidence tending to show that the deceased had a gun at his home, which amounted to but little. When giving his testimony on cross-examination, he used profanity a number of times and acted in such a way and manner before the jury that showed that he was a bad man and cared very little as to what the consequences might be.

After reading the evidence carefully in the case, we have come to the conclusion that appellant was not in any respect justified in killing the deceased; that the jury made no mistake in finding him guilty. The court is very reluctant in reversing this case and were it not for the misconduct of the Commonwealth's attorney and his assistant, in arguing the case to the jury, the court would uphold the judgment. The misconduct of the Commonwealth's attorney, as shown by the record, is of such importance, when we consider that every man, however guilty he may be, under our laws, is entitled to a fair and impartial trial, and that the jury that tries him should be controlled only by an honest desire to give the defendant such a trial.

The Honorable Carl Perkins, counsel for the Commonwealth, in closing his argument to the jury, made the following statements:

"The attorney displayed the shirt that the deceased was killed in, before the jury, and pointed out the bullet holes in the shirt to them.

"The attorney displayed the shirt again before the jury pointing out holes in it saying that they were bullet holes.

"The attorney read some of the evidence from notes he had taken down, to which objection the court said: 'You have no right to read the evidence to the jury.'

"Now, if you Gentlemen of the jury got any remorse of conscience for sending a man like that to the electric chair—

"Let crime like this exist! Don't send a man where he will get out in ten or fifteen years."

Such statements as those we think unwarranted and not authorized by the evidence in the record and are calculated to stir up passion and prejudice in the jury. It is true the court, after those remarks were made, told the jury that the attorney had a right to say what they are entitled to do, but not what they must do. That explanation and admonition on the part of the court would possibly have cured the error on the part of the attorney had it ended there. However, in making the closing argument, the Honorable O. C. Hall, Commonwealth's attorney, over the protest of the court, repeatedly made statements that no prosecuting officer of the law should ever be guilty of making, which we are here quoting:

"We got to give an account for everything we do. We got to answer for every verdict we write, and if you write a verdict under a manslaughter instruction, you might become an accessory to murder. * * * I can take all the evidence and show you that this poor ex-service man was once a barefooted boy, was playing around his mother's knee, he was somebody's darling, and had a right to live. This bootlegger, this moonshiner, coming in here and claiming self-defense. * * * The only thing that you got against this boy is, that he went across the waters and fought for his home, and fought for you and me and lost his eye. * * * The grand jury said that Beckham Napier killed this man in Knott county, Kentucky, and before the finding of this indictment, and they come in here to plead guilty and begged for mercy. * * * I got a right to say that. I got the Court of Appeals to back me up, and that he was begging for life or mercy. * * * I am asking you jurors, if you can't send this man to the electric chair, don't write a verdict. Go in there and hang and I will get another jury to try him. * * * If you won't give this man what he is entitled to, hang, hang until hell freezes over. * * * If you can't give him death, turn him loose. * * * This man going around here begging for a life

sentence. * * * You go out and write a verdict, and if you can't write it for a death penalty, don't write it at all. * * * That is the notion of the Commonwealth's attorney. I have been elected by you and what I want is the death penalty, and if you can't give it, don't give him anything. Beckham Napier sitting over there sniggering. Is murder to be laughed at? If it is, turn him loose, and if it is. not, put the wires around him and burn him until he is dead. If you won't write a verdict of death, don't give him anything. If you won't do it, I will get a jury from some other county that will write it.''

It is true that the court sustained objections to the above remarks and admonished the jury to consider only the evidence, but regardless of the objections on the part of the court, this attorney in the face of all used this language: ''I got a right to say that.'' Counsel for defendant moved the court to set aside the swearing of the jury and continue the case on account of the improper statements and arguments complained of, by the Commonwealth's attorney, the Honorable O. C. Hall, and the Honorable Carl Perkins, counsel for the Commonwealth. After the speech of the Commonwealth's attorney had ended, the court, with an honest and sincere purpose, as we believe, to give this man a fair trial, and in an effort to withdraw the effect of the improper statements, that the Commonwealth's attorney had made, admonished the jury that neither the Commonwealth's attorney nor the Honorable Carl Perkins had a right to make improper statements or arguments outside of the record that was not in the evidence.

This court has so often heretofore in the strongest. language possible condemned arguments, such as herein referred to, and it occurs to the court attorneys for the Commonwealth should not permit themselves, in their earnestness, enthusiasm, and vigor in prosecuting criminals, to lose their heads and forget, as the Commonwealth's attorney in this case did, that every man, however guilty, in this civilized land of ours is entitled to a fair trial by an unprejudiced and unbiased jury. He should not forget that it is a part of his duty to see that no evidence is presented to the jury that is incompetent or unfair; that nothing should be said by him in an argument that is not based upon the competent

evidence in the record; that no statements should be made unless deducible from the evidence in the record that would be calculated to mislead or stir up the prejudice of the jury selected to try the case. As has been often said by this court, the Commonwealth's attorney is an officer of the law; in fact, a quasi judicial officer. Dalton v. Commonwealth, 216 Ky. 317, 287 S. W. 898. We doubt that there has ever reached this court, where the Commonwealth's attorney and his assistant lost themselves to such an extent and in their arguments made as many improper and uncalled for statements as in this case. The Commonwealth's attorney went so far as to say to the jury, if they should write a verdict under a manslaughter instruction, they might become an accessory to murder; and again, went so far as to say, over the objection of the court, for the testimony referred to was in no respect competent, that the defendant was a bootlegger, a moonshiner, and came in there claiming self-defense, and the worst thing that he said was that before the finding of the indictment they came in here to plead guilty and to beg for mercy; further, said that if you want to give him what he is entitled to, "hang this man until Hell freezes over"; also said: "If they could not give him death to turn him loose"; "that he had been going around here begging for a life sentence." It is true the court admonished the jury that such remarks were improper and not in the record and they should not consider them, but that could not and would not remove the effect of such a statement. Again, he said: "You go in and write a verdict and if you cannot write it for a death penalty, don't write it at all"; that what he wanted was the death penalty, and "if you cannot give him that, give him nothing and if you can't do that, don't do anything and if you won't do it, I will get a jury from some other county that will write it." It is not conceivable that any statements could have been made that would be more calculated to embarrass, intimidate, and stir up the passion and prejudice of a jury than those statements. No one, in making those statements, would have more influence over a jury than the Commonwealth's attorney, an officer of the law, who has taken an oath to see that the law is enforced properly. We have been driven by these uncalled for remarks and statements made by the Commonwealth's attorney and his assistant, which are entirely improper and prejudi-

cial to the rights of appellants, and dehors the record, to reverse the case. We have often condemned arguments less prejudicial than in the instant case; thereby hoping that the Commonwealth's attorneys and other attorneys, who represent the Commonwealth, would not forget themselves and violate their duty, which of necessity results in additional expense and costs to the Commonwealth of having another trial. Again, we collect for the benefit of these officers the large number of cases where such arguments have been condemned. Howerton v. Commonwealth, 129 Ky. 482, 112 S. W. 606, 33 Ky. Law Rep. 1008; Bailey v. Commonwealth, 193 Ky. 687, 237 S. W. 415; Bazzell v. Illinois Cent. R. Co., 203 Ky. 626, 262 S. W. 966, 967; Little v. Commonwealth, 209 Ky. 263, 272 S. W. 721; Dalton v. Commonwealth, 216 Ky. 317, 287 S. W. 898; Johnson v. Commonwealth, 217 Ky. 565, 290 S. W. 325; Bennett v. Commonwealth, 234 Ky. 333, 28 S. W. (2d) 24; Gilbert v. Commonwealth, 106 Ky. 919, 51 S. W. 804, 21 Ky. Law Rep. 544; Jones v. Commonwealth, 213 Ky. 356, 281 S. W. 164; Mount v. Commonwealth, 120 Ky. 398, 86 S. W. 707, 27 Ky. Law Rep. 788; Baker v. Commonwealth, 106 Ky. 212, 50 S. W. 54, 20 Ky. Law Rep. 1778; Little v. Commonwealth, 221 Ky. 696, 299 S. W. 563; Napier v. Commonwealth, 215 Ky. 847, 287 S. W. 21; Slaughter v. Commonwealth, 149 Ky. 5, 147 S. W. 751; Linde v. Commonwealth, 208 Ky. 98, 270 S. W. 451; Howard v. Commonwealth, 110 Ky. 356, 61 S. W. 756, 22 Ky. Law Rep. 1845; Goff v. Commonwealth, 241 Ky. 428, 44 S. W. (2d) 306.

Wherefore, the judgment is reversed for proceedings consistent herewith.

Whole Court sitting.