**Beckham B. BARNES, Appellant,**

v.

**COMMONWEALTH OF KENTUCKY, Appellee.**

**No. 2001–SC–0544–MR.**

Supreme Court of Kentucky.

Dec. 19, 2002.

William E. Johnson, Johnson, Judy, True & Guarnieri, LLP, Frankfort, David Lewis Williams, Burkesville, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Susan Roncarti, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

Appellant Beckham B. ("B.B.") Barnes was convicted by a Wayne Circuit Court jury of intentionally killing Troy Miller, for which he was sentenced to twenty-two years in prison. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). We reverse and remand for a new trial because the prosecutor's closing argument violated Appellant's right to a fair trial.

## I. FACTS.

Appellant admitted killing Miller but contended that he did so in self-defense. Appellant and Miller were friends and had a business relationship. Appellant was a civil engineer and land surveyor, and had hired Miller as an apprentice shortly after Miller graduated from high school. After several years, Miller started his own business. However, he continued to seek Appellant's assistance and to use the maps, computer, and other equipment in Appellant's office. When Miller did seek Appellant's help on a project, he would pay Appellant a fee of twenty percent.

Appellant was helping Miller with such a project at Appellant's office on the evening of April 1, 1999. The office computer showed initial activity on that project from 9:45 p.m. until 10:07 p.m. However, when the two finished, Appellant would not permit Miller to print the project. Apparently, they had agreed to settle their accounts on a quarterly basis, but Miller had not paid Appellant for his assistance for the last quarter of 1998 and the first quarter of 1999. Appellant told Miller that he could print the project only when he paid Appellant what he owed. According to Appellant, Miller did not seem overly upset by this interdiction and left the office peacefully. Appellant also went home (his residence is across the road from the barn constituting his office) and fell asleep watching television.

Appellant alleged that he was awakened sometime in the early morning hours of April 2, 1999, by the sound of his dog barking. The dog led him to his office. The night was foggy, but Appellant saw movement by the light of the office computer screen. He crept towards the office, opened a door, and yelled "freeze." He heard loud gunshots, returned fire with a rifle that he kept in the office, and ran

back to his residence, where he informed his wife, Paula Barnes, that it appeared that he had shot an unidentified intruder. Appellant claimed that he did not realize that Miller was the intruder until he was informed of that fact sometime later that morning.

Paula Barnes called the "911" emergency operator at 2:13 a.m. She reported to the operator that a male had been shot, but gave little other information. Law enforcement authorities arrived at approximately 2:38 a.m. Deputy Sheriff Garner testified that it was so foggy he had to shine his spotlight on the ditches in order to stay on the roadway. The police described Appellant and his wife as relatively "close-lipped." Appellant testified at trial that he did not trust one of the investigating officers, Scott Hammond, whose family had had previous disagreements with the Barnes family. In any event, he told the officers little more than that the intruder was "in the barn" and that "I saw him go down." Appellant then informed the police that he would not say anything else until his lawyer arrived. He refused a gunshot residue test. Paula Barnes had also called Appellant's parents, Wilbur and Margie Barnes, who arrived at their son's residence shortly after the police.

Police found Troy Miller dead on the floor of Appellant's office. He had been killed by two shots to the chest from a hunting rifle. Next to Miller's hand was a .38 caliber pistol, which police later determined was owned by Miller's girlfriend, Kathy Wade. Three spent rounds from the .38 caliber pistol were found embedded in the walls and shelving of the office, including one in the doorframe where Appellant

alleged that he had entered the office. The pistol was later determined to be an "emitter," *i.e.*, it had a tendency to emit antimony, but a gunshot residue expert found an "insignificant" amount of antimony on Miller's hands. However, she clarified that "this does not eliminate the possibility that [Miller] handled or discharged a firearm." No fingerprints were found on that pistol. The pistol also appeared to the police to be clean of blood, although no formal test was ever conducted to confirm this observation.

The office computer's internal log showed that there had been additional activity on Miller's project beginning at 12:40 a.m. and ending at 1:52 a.m. The police found Miller's truck parked one-half mile away from the office at a house used by the community, including Miller and Appellant, for activities like hunting. Police found a second gun wrapped in a T-shirt in Miller's truck which had no discernable relevance to Miller's death except that Appellant had owned a gun of the same make and model [1] and the serial numbers had recently been filed off the gun. A solitary shaving from the filings of that gun was found on a sock Miller was wearing when he died. No shavings were found on the clothes Appellant was wearing at the time of his arrest. This gun had not been recently fired.

The Commonwealth's theory was that Appellant had "cold-bloodedly" killed Miller and afterwards "doctored" the crime scene with the help of his father. Under this theory, Wilbur Barnes arrived before the law enforcement officers. Wilbur then filed the serial numbers off the gun that was eventually found in Miller's truck with

---

1. Appellant claimed that he had given that gun (of the same make and model as the gun found in Miller's truck) to a woman with whom he had had an affair, that this woman had given the gun to Miller, and that Miller had in turn paid Appellant for the gun. However, while the woman admitted that she had given a gun to Miller, she denied that the gun she had given to Miller was the same gun as the one found in the truck.

the intention that it would serve as the "throw-down" gun. However, after the filing was complete, they discovered Wade's pistol in Miller's truck, and decided to use that as the "throw-down" weapon instead. They then left the first gun in Miller's truck and went to the crime scene, fired three shots from Wade's pistol into the walls and shelving of the office, wiped the pistol clean of fingerprints, and placed it next to Miller's hand, being careful not to leave any footprints in the blood pooling on the floor. The two then drove Miller's truck to the house one-half mile away, and returned together to Barnes's residence. Wilbur Barnes then drove home to clean up before returning to Appellant's residence, arriving shortly after the police.

In support of its theory that Appellant had doctored the crime scene, the Commonwealth offered law enforcement testimony that Wilbur Barnes was alone when he drove into Appellant's driveway. This was inconsistent with Wilbur and Margie Barnes's testimony that they drove together and with the fact that Margie Barnes was present at her son's home that night. Although Margie testified at the grand jury proceeding that she and Wilbur had walked to the house together after parking, both Wilbur and Margie testified at the trial that Wilbur had first dropped Margie off at the house and then parked. The Commonwealth also argued that because Margie Barnes had heard her son invoke his rights to counsel and silence to an officer, and that Appellant had invoked his rights to an officer before Wilbur arrived, Margie must have been present at the house before Wilbur arrived. Defense counsel pointed out that Appellant invoked his rights to several officers that night at several different times.

There was no evidence that Appellant had any motive to kill Miller, although the prosecutor noted during closing argument that Appellant and Miller were business competitors and speculated that Appellant would get more business if Miller were out of the way.

## II. CLOSING ARGUMENT.

We need not address every improper argument in the summation. Suffice it to say that the trial judge sustained twenty-nine objections during the prosecutor's closing argument and admonished the jury eleven times. Many of the sustained objections pertained to misstatements of the evidence. Others included a reference to the fact that the prosecutor's son was a state trooper, and a comparison of this case to the O.J. Simpson trial. The most egregious, however, and one to which defense counsel's objection was overruled, was the prosecutor's statement to the jury that to acquit Appellant would be a crime worse than murder.

> Ladies and Gentlemen there would be only one crime greater than this, the brutal taking of the life of Troy Miller. And that would be to allow this man to pull the wool over the eyes of Justice, and walk out of here with his liberty when he took this man's life.

Our cases have consistently held that a prosecutor may not imply that an acquittal would be equivalent to a criminal act. In reversing because of improper closing argument, our predecessor Court held in *Meland v. Commonwealth*, Ky., 280 S.W.2d 145 (1955), that "[a] threat made against the jury that they will be considered in the same class as is [the] accused and held up to scorn by the good citizens of the community should they acquit him, will never be tolerated by this court." *Id.* at 147. In *Napier v. Commonwealth*, 268 Ky. 482, 105 S.W.2d 594 (1937), reversal was required when "[t]he Commonwealth's attorney went so far as to say to the jury, if they should write a verdict under a

manslaughter instruction, they might become an accessory to murder." 105 S.W.2d at 598. *See also Stasel v. Commonwealth,* Ky., 278 S.W.2d 727, 729 (1955) (reversing because the jury was effectively told that they would receive the condemnation of the community if they acquitted defendant); *Goff v. Commonwealth,* 241 Ky. 428, 44 S.W.2d 306, 308 (1931) (reversing because jurors were told they would be "traitors" and "in a class with Judas" if they returned a verdict of acquittal).

▉ Such an argument is not an argument on the evidence and serves no purpose other than to inflame the jury. As noted in *Napier,* the Commonwealth's Attorney is "an officer of the law, who has taken an oath to see that the law is enforced properly." 105 S.W.2d at 598. Given this position, "[n]o one, in making those statements, would have more influence over a jury . . . ." *Id.* And, as the Supreme Court of the United States has observed,

> [T]he average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *Tinsley v. Commonwealth,* 312 Ky. 745, 229 S.W.2d 761, 763 (1950). Of course, it is the jury's civic duty to acquit the defendant if the evidence does not establish his guilt beyond a reasonable doubt. To suggest that the exercise of that duty would be a crime worse than murder was inexcusable.

▉ The error was not harmless. Following the Court of Appeals for the Sixth Circuit, we reverse for prosecutorial

misconduct in a closing argument only if the misconduct is "flagrant" *or* if each of the following three conditions is satisfied:

(1) Proof of defendant's guilt is not overwhelming;

(2) Defense counsel objected; and

(3) The trial court failed to cure the error with a sufficient admonishment to the jury.

*United States v. Carroll,* 26 F.3d 1380, 1390 (6th Cir.1994); *United States v. Bess,* 593 F.2d 749, 757 (6th Cir.1979). We need not decide whether the misconduct was "flagrant" because each of the three conditions set forth *supra* was satisfied in the instant case. Defense counsel objected to the argument and the trial court overruled the objection, thus eliminating the possibility of curing the error by admonition. (An admonition is appropriate only if the objection is sustained.)

Proof of Appellant's guilt was not overwhelming. The prosecutor's case, in fact, focused largely on the fact that Appellant had invoked his right to counsel and declined to provide police with all the information necessary to their investigation. Indeed, the prosecutor told the jury during closing argument that Appellant's invocation of his rights had the effect of sending the officers "into harm's way" (assuming there had been more than one gunman in the barn or that the shooter was still alive), using that occasion to insert the extra-judicial information that his own son was a state trooper. *See Bowler v. Commonwealth,* Ky., 558 S.W.2d 169, 172 (1977) (prosecutor "is limited to fair argument on matters in the record and legitimate deductions therefrom" and "may not testify"). The prosecutor also told the jury that Appellant's invocation of his right to silence is what made him a suspect and distinguished his case from those self-defense shootings that are cleared by the

police.[2] This argument had marginal probative value at best. *Cf. United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975) (finding that probative value of silence at time of arrest was minimal); *Price v. Commonwealth,* Ky., 31 S.W.3d 885, 891 (2000) ("even an innocent person is likely to want to consult an attorney if accused of a crime which he did not commit.").

The theory that Appellant and his father doctored the crime scene, while not inconsistent with the evidence, was also not syllogistic. No telephone records contradicted Paula Barnes's testimony that she did not call Wilbur and Margie Barnes until after calling the 911 operator. The computer's internal log showed that the additional activity on Miller's project ended at 1:52 a.m. The 911 call began at 2:13 a.m., and the police arrived at 2:38 a.m. The Barnes families lived six miles apart. Thus, the jury was required to believe that in less than twenty-five minutes, Wilbur Barnes was awakened by Paula's call, dressed, got in his vehicle along with his wife, drove six miles in a dense fog, helped Appellant (at least)[3] drive Miller's truck to a location one-half mile away, then drove back home to clean up, returning to Appellant's residence a few minutes after the police arrived. Even if Paula had called Wilbur and Margie before she called the 911 operator, only a few more minutes could have been added to the time line.

Nor was a credible motive ever established. The jury was forced to base its

verdict almost entirely upon its disbelief of Appellant's account of the incident. Accordingly, the evidence of Appellant's guilt was not "overwhelming," thus the prejudicial statement made by the prosecutor requires reversal in accordance with *Bess* and *Carroll, supra.*

■ Although we are reversing this case on the "acquittal is equivalent to murder" argument, we choose also to address the prosecutor's repeated reference to the O.J. Simpson trial. The first reference had occurred during the prosecutor's cross-examination of Appellant. Defense counsel's objection to that reference was sustained and the trial judge admonished the jury not to consider it. Nevertheless, the prosecutor made the same reference again during closing argument. A similar reference has been held to require reversal. *See DeFreitas v. State,* 701 So.2d 593, 601 (Fla.Dist.Ct.App.1997) (reversing when prosecutor, *inter alia,* compared defendant's trial to the O.J. Simpson case). *See also State v. Thompson,* 578 N.W.2d 734, 743 (Minn.1998) (prosecutorial misconduct found where the prosecutor compared the defendant to O.J. Simpson). It is also elementary that evidence that has been excluded by the trial judge cannot be referred to in closing argument. *Mack v. Commonwealth,* Ky., 860 S.W.2d 275, 276–77 (1993); *Moore v. Commonwealth,* Ky., 634 S.W.2d 426, 438 (1982); *Nolan v. Commonwealth,* 261 Ky. 384, 87 S.W.2d 946, 950 (1936). *See also Graves v. Common-*

**2.** We have not been asked specifically to address the propriety of this argument, and therefore avoid deciding this difficult and complicated question. We note, however, that there is a split among the federal Courts of Appeals as to whether the *substantive* use of prearrest silence is constitutionally permitted. *See Combs v. Coyle,* 205 F.3d 269, 279–83 (6th Cir.2000).

**3.** The prosecutor also declared in summation that he believed that Wilbur Barnes had filed the serial numbers off the gun found in Miller's truck, and, presumably, planted the shaving that was found on Miller's sock. However, the jury might have concluded that Miller had filed the serial numbers for some reason unrelated to the incident, or that Appellant had done so while Wilbur was in transit (though no shavings were found on Appellant's clothing).

*wealth,* Ky., 528 S.W.2d 665, 666 (1975) (condemning closing argument that ignored a previous admonition). Since we are reversing because of an error to which an objection was overruled, we need not decide whether it was error to deny defendant's motion for a mistrial, made after the prosecutor's second reference to the O.J. Simpson trial.

## III. DIRECTED VERDICT.

■■ Appellant also claims that the evidence was insufficient to convict him and that the trial court should have directed a verdict of acquittal.[4] We disagree.

Rarely is a defendant relying upon self-defense entitled to a directed verdict. Only in the unusual case in which the evidence conclusively establishes justification and all of the elements of self-defense are present is it proper to direct a verdict of not guilty.

*West v. Commonwealth,* Ky., 780 S.W.2d 600, 601 (1989). As noted in *West, supra,* and in *Taul v. Commonwealth,* Ky., 249 S.W.2d 45 (1952), the jury is not required to accept the defendant's version of events at face value. *Id.* at 47; *West, supra,* at 601. Indeed, every defendant who asserts self-defense "bears the risk that the jury will not be persuaded of his version of the facts." *Id.*

■ Although the evidence against Appellant was not overwhelming, it was sufficient to allow a reasonable jury to believe beyond a reasonable doubt that Appellant did not shoot Miller in self-defense. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991). There was sufficient time for Appellant and his father to "doctor" the crime scene (although just barely). The pistol that Miller allegedly fired at Appellant was free of fingerprints and ap-

parently free of blood. In addition, the gunshot residue test showed an "insignificant" amount of antimony on Miller's hands, casting some doubt on the proposition that Miller had fired the pistol three times. Finally, Miller was known to work late at Appellant's office (although it is unclear whether he ever did so unsupervised), and a reasonable jury could have doubted Appellant's claim that Miller was an unidentified intruder. We conclude that there was sufficient evidence to submit the question of justification to the jury.

The cases cited by Appellant are inapposite. *Holcomb v. Commonwealth,* Ky., 280 S.W.2d 499 (1955), held that a directed verdict of acquittal was appropriate because several witnesses confirmed that the deceased had been in the midst of a violent rampage when the defendant shot him in the leg, apparently attempting to "stop deceased in his actions, rather than to kill him." *Id.* at 500. In *Taul, supra,* the deceased had previously threatened the defendant, had a reputation for violence, and the Attorney General refused to argue on appeal that the defendant was not entitled to a directed verdict of acquittal. *Id.* at 47. In the instant case, the only surviving witness to the incident was Appellant. There was testimony that Miller had a reputation for peace and quietude, and even Appellant could provide no reason why Miller would shoot at him that night. We conclude there was sufficient evidence to avoid a directed verdict of acquittal.

Accordingly, the judgment of conviction and the sentence imposed are reversed and this case is remanded to the Wayne Circuit Court for a new trial.

LAMBERT, C.J.; GRAVES, JOHNSTONE, KELLER, and STUMBO, JJ., concur.

---

4. The trial log and the trial judge's affidavit make it clear that a motion for a directed verdict was made and denied in addition to the motion for judgment notwithstanding the verdict, despite the fact that the motion for a directed verdict was not videotaped.

WINTERSHEIMER, J., dissents because there was no prosecutorial misconduct.