Billy Reed CAUDILL, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000119–MR.

Supreme Court of Kentucky.

Aug. 23, 2012.

---

V. Gene Lewter, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Frankfort, KY, Counsel for Appellee.

## OPINION OF THE COURT

This is a matter of right appeal in a case wherein Appellant was convicted of one count of murder and three counts of wanton endangerment in the first degree, pursuant to a guilty verdict. Per the jury recommendation, the trial court sentenced the Appellant to twenty years for murder and five years for each of the three counts

of wanton endangerment, to run consecutively for a maximum term of imprisonment of 35 years.[1] This matter of right appeal followed.

Appellant's primary arguments are that: (1) there was insufficient proof to support a charge of murder because the Commonwealth failed to establish, beyond a reasonable doubt, that the Appellant was not privileged to act in self-defense; and (2) that certain conduct of the Commonwealth Attorney during his cross-examination of Appellant amounted to reversible prosecutorial misconduct. For the reasons set forth herein, we agree that improper conduct during the Commonwealth Attorney's cross-examination of the Appellant constituted reversible prosecutorial misconduct. Therefore, we vacate the convictions for murder and wanton endangerment and remand the case for further proceedings.

This case involves a 12–second shoot-out between two neighbors that occurred on August 21, 2009. The Appellant and Randall Carpenter (Carpenter) were neighbors in Breathitt County, Kentucky. Across the street from where Appellant and Carpenter lived, respectively, were the homes of Shirley Hudson and Willena White. The two men harbored animosity toward one another over a longstanding property dispute. As a result, Appellant had installed numerous security cameras throughout his property and frequently kept a tape recorder on his person. On August 21, 2009, the Appellant and Carpenter had two verbal altercations over the location of a cedar log. A third, and final, verbal exchange lead to each man firing a weapon at the other. Appellant was shot twice by Carpenter with a 9mm handgun and he sustained serious injuries to his hip and right upper arm. Carpenter sustained a single, fatal, bullet wound to the head from the Appellant's rifle. Carpenter died

at the scene and Appellant was transported by ambulance for emergency medical care. Appellant was charged with the murder of Carpenter.

Carpenter's son, Brandon, testified that his father moved to Breathitt County after he retired in 2005 or 2006. He was aware of an ongoing property dispute between his father and the Appellant.

Shirley testified that she had known Carpenter, a first cousin to her late husband, ever since she married. Her family had participated in lawsuits filed by the Appellant for over 10 years regarding the location of property lines and she had been prepared to testify during those proceedings. On the day of the fatal shooting, she first saw the Appellant when he and Carpenter were engaged in a verbal altercation. At the time, Carpenter was on his tractor and the Appellant had a rifle which was cradled across his arms. Appellant was speaking in a muffled voice but she heard Carpenter laughing when he said, "Well you got the gun, are you going to shoot me?" After Carpenter drove away and parked his tractor on her property, the Appellant walked over, carrying his rifle, and got into another argument with Carpenter. The Appellant appeared to be trying to hide the gun from the view of his security cameras. She did not hear Carpenter threaten the Appellant or produce any weapon during these arguments; however, she believed Appellant was threatening Carpenter based on his demeanor and the fact that he had a gun.

Shirley testified that the final encounter occurred later, when the Appellant backed his car down the driveway and started doing something in the ditch. At that time, Carpenter walked over to see what the Appellant was doing. The two men

---

exchanged words. When Carpenter got to the edge of the other side of the road, Appellant eased over to the trunk of his car, got a gun out, and started shooting. She did not see Carpenter with a gun at any time.[2] She saw Carpenter jumping trying to dodge bullets as he ran over and lay down in the ditch line. After the shootout, the Appellant got into his car and drove back up to his trailer. At that point, Appellant sat on his front porch with the rifle still in his hand. Shirley was afraid to go back outside her home because she thought Appellant would start shooting again. On cross-examination, she reiterated that she never saw Carpenter with a gun. She could not explain her prior statement to the police that Carpenter did have a gun, rather she testified at trial that she did not know Carpenter had a gun and that it was the Appellant who started shooting.

Michael Todd Hudson, Shirley's son, testified that he was related to Carpenter as a second cousin. He was visiting his mother and helping her clean and maintain her property on the day of the fatal shooting. He did not see any of the prior two altercations between Appellant and Carpenter that day. He had been inside his mother's house cooling off when he heard Carpenter, his mother, and Willena talking outside. He went outside to join them, but then went into the garage to work on a weed eater. He heard the two men arguing and walked back out to see what was going on. At that time, Carpenter was in front of Willena's house and Appellant was standing at the back side of his car, near the trunk. He did not see a weapon in the Appellant's hand. He then went back into the garage. He acknowledged that he did not "see" the first shot, but that he "heard" it, and was standing halfway through his mother's garage when he heard it. At that point, he immediately ran out to his mother and Willena, grabbed them, and ran into the garage. He did not see any shots being fired, but he saw Carpenter "highstepping" across the driveway as he was pushing his mother and Willena into the garage. He could feel the ricochet of dirt hitting his back while he was running into the house. His mother called "911" and he took over for her on the phone because she was too distraught to talk to emergency personnel. He did not recall what he told them on the phone. When he went back outside, he saw Carpenter in the ditch. The Appellant was getting into his car and going up the hill to his home. He saw Appellant crawl up the stairs into his home and go inside.[3] He had never seen Carpenter drink a beer, smoke marijuana, or have a gun.[4]

Willena testified that she was a first cousin of Carpenter and also a cousin of the Appellant, but that she was uncertain as to what degree. The morning of the fatal shooting, she had coffee with Carpenter when he came to check on her. Afterwards, he began mowing grass by the creek on the side of Shirley's house using a tractor. She saw the Appellant and Carpenter engaged in verbal confrontations on

2. Her testimony conflicts with the testimony of Willena who stated that she saw Carpenter with a gun visible in a holster that day and with the ballistic evidence which showed that Carpenter fired 9 rounds from his handgun during the shootout.

3. In contrast, his mother Shirley testified that she saw the Appellant get out of his car and stand on his front porch holding his rifle.

4. The medical evidence revealed that Carpenter had a blood alcohol level of .107 percent and 3.6 nanograms per milliliter of marijuana in his blood. Moreover, Willena White testified that Carpenter carried a gun visible on his person "all the time" and that he did so that day.

two different occasions prior to the fatal shooting. The first time she saw Appellant that day, the Appellant and Carpenter were yelling and cussing at each other while Carpenter was checking the grass seed on his property. Willena was with Shirley when they heard arguing. She saw the Appellant with a rifle behind his leg "so the camera couldn't pick it up."[5] She saw that Carpenter had a handgun either in his pocket or in a holster. The confrontation lasted five or ten minutes, after which time Carpenter got onto his tractor and the Appellant walked down the hill. She said that she did not hear the Appellant threaten to kill Carpenter.

She also reported seeing Carpenter throwing some rocks and a log that the Appellant had spiked into the ground into a ditch line. Carpenter then backed his tractor out into the road and parked it at Shirley's house.

Willena testified that she had returned home from errands at about 4:10 p.m. and afterwards she went to Shirley's house. Shirley's son Michael Todd was there also. Carpenter walked back over to the log and rocks after he saw they had been returned to their original spot and moved the log again. At this point, Appellant backed his car down his driveway, popped open the trunk of his car, got out of the car, and he and Carpenter began yelling at one another. She did not see the Appellant working in the ditch line. She testified that Car-

penter always packed a gun and that she had seen him with the gun visible on his person when they were together earlier, and that Appellant would have seen the gun on Carpenter's person. She did not see whether the Appellant had a gun while the two men were arguing the final time, but that after they had argued some time, the Appellant got a rifle out of his trunk. She said she would have seen if Carpenter had pointed his gun at the Appellant. She stated on direct that the Appellant fired the first shot, however, she acknowledged on cross-examination that when questioned the night of the shooting she had reported to investigating officers that she "heard" but did not "see" the first shot. She testified that Carpenter "got off a few shots" while he was on his knees after having jumped into the ditch line.[6]

Willena testified that Michael Todd, who had been napping inside, came out through the garage after the first couple of shots were fired, and pulled her and Shirley in the house. She went to the living room window and saw Carpenter on his knees, not moving, and Appellant on the ground. She saw the Appellant crawl into his car and drive back to his home, but her view after he went up the hill was obstructed.[7] She did not notice the smell of alcohol on Carpenter and testified that he only drank alcohol when he was done working for the day.[8]

---

**5.** In contrast, Shirley testified that she also observed this confrontation, and that during the confrontation, the Appellant was cradling his rifle across his body using both arms.

**6.** Her testimony on this point appears to be in direct conflict with the testimony of Detective Sandlin and the objective evidence, which demonstrated that Carpenter shot all the rounds from his 9mm gun while still on the right side of the driveway, and not in the ditch line. Willena testified explicitly, multiple times, that she "saw" Carpenter "get off a

couple of shots" while on his knees in the ditch line.

**7.** In contrast, Shirley testified that she could see the Appellant after he got out of his car and that he was standing on his front porch holding his rifle.

**8.** Her testimony about Carpenter's drinking habits conflicts with the medical evidence, which revealed that Carpenter had a blood alcohol level of .107 percent and 3.6 nanograms per milliliter of marijuana in his blood.

Trooper James Gross of the Kentucky State Police testified that he was dispatched to the scene of the shooting that evening. Upon his arrival, he located Carpenter in the ditch line, obviously deceased, with a gunshot wound to the head. A witness came out of the garage and told him there had been an argument and a gun battle. Thereafter, Jackson City Police Officer John Marshall responded to the residence and the two of them went up to find the Appellant. He instructed the Appellant to come to the door and the Appellant complied. Trooper Gross testified that he found a rifle in the kitchen area. He did not recall Appellant making any statements concerning the rifle. He assisted getting Appellant into an ambulance and secured the scene.

Officer Marshall testified that he and Appellant are first cousins. When he arrived at the scene of the shooting, he saw Carpenter in the ditch line and he accompanied Trooper Gross to Appellant's trailer. Appellant told him, "John, I don't have a gun, I throwed it in the kitchen." Also, Appellant told him that there was an audio and video recording of the event, and the Appellant retrieved a pocket-sized recorder from his shirt pocket. The Appellant reported that he had to shoot back after the other guy "went crazy" and started shooting. Appellant thought he shot one half of a magazine and that he thought Carpenter shot "a lot." Officer Marshall went to the bottom of the road and looked to see where the bullet holes were and he notified Detective Sandlin of the whereabouts of the audio and video recording equipment.

Detective Gary Sandlin of the Kentucky State Police surveyed the scene of the shooting. There were nine spent 9mm casings from the gun associated with Carpenter and discovered under his body. There were ten spent rifle casings from the rifle associated with the Appellant. The spent 9mm bullet casings were retrieved from the trunk and left rear quarter panel of the Appellant's car. He measured the distance from Carpenter's body to the various spent rifle casings and noted that the closest casing was 34 feet and the farthest was 49 feet. During his testimony, Detective Sandlin narrated a video taken of the property where the shooting occurred that was shown to the jury.

As to the video recording made by the Appellant, Detective Sandlin explained that the quality of the video was very poor. He described that, at one point in the tape, he could see the Appellant's car at the bottom of the driveway and Carpenter walking, however, it was too distorted to be useful. He recovered the audio tape inside the tape recorder. The audio tape was played for the jury, and although parts of the tape were muffled, it appeared to reveal the following exchange immediately prior to the shooting:

Appellant: You better stay the hell away from me.

Carpenter: Oh, is that right?

Appellant: You better leave my property alone, too.

Carpenter: (Yelling) Fuck you! You don't own this, you stupid fucking bastard!

Appellant: Stay away from me.

Carpenter: Fuck you. Stay away from me, you stupid fucking ignorant bastard. You're on my property.

Appellant: It ain't your goddamn property.

Carpenter: Your fucking ass. You don't even have . . . you know what I own and what you own.

Appellant: You don't own a fucking thing.

Carpenter: You piece of fucking shit.

Appellant: Don't come back up the driveway. Stay away from me.

Carpenter: You yellow bellied fucking coward. Mother fucker.

Appellant: Don't come up this driveway with that fucking tractor of yours. I don't like your goddamn bullshit.

Carpenter: What's the matter, mother fucker? You got rocks . . . ? You fucking chicken shit mother fucker. You don't own this mother fucker . . . you gotta have proof. You couldn't win before because you don't have proof, you fucking coward mother fucker. You ain't nothing but a fucking lizard.

Appellant: You can get . . . out of my fucking driveway and don't come back.

Carpenter: Oh, now you are acting like a fucking bad ass.

Appellant: Yeah, you're really asking for it.

Carpenter: I'd like to fuck you in your ass. I'd like to fuck you in your ass, you little cunt. I'd grab your ears and fuck your guts out.

Appellant: This is my goddamn property.

Carpenter: That's my property. (inaudible)

Appellant: I said that's close enough.

Carpenter: (Yelling) Don't do that.

Appellant: I said that's close enough.

Carpenter: Don't point at me, you're making me scared. Don't point at me. You might have something on you. Get off my property.

Appellant: Go ahead. Go ahead and use it. Go ahead.

(12 seconds of shooting)

The tape then reveals the Appellant calling "911" to report shooting Carpenter after Carpenter shot at him with an automatic 9mm. He told emergency personnel that he thought Carpenter was intoxicated.

Dr. John C. Hunsaker, a forensic pathologist and Assistant Medical Examiner, testified that he determined that Carpenter died as a result of a single gunshot wound to the head. He reported no other bullet wounds. A blood test indicated that Carpenter's blood alcohol level at the time was .107 percent and it also detected 3.6 nanograms per milliliter of marijuana. A urinalysis revealed 146 nanograms per milliliter of marijuana and contained .160 percent alcohol. The vitreous humor of the eye contained .129 percent alcohol. Dr. Hunsaker opined that the higher sample of alcohol in the urine was indicative of the stage of consumption, such that Carpenter had been consuming alcohol long enough for that amount to be excreted as urine.

Barry Dickey, a private forensic audio examiner, reviewed the audio tape at the request of Appellant and testified at the trial. He opined that Carpenter's handgun, and not the Appellant's rifle, fired the first shots heard on the tape, and that the second set of shots were consistent with the Appellant's rifle. He reported distinct differences between the two sets of shots with the first shots associated with the exchange having a dynamic level of about 49 decibels with a very short dissipation or decay of 100 milliseconds, compared to a separate set of shots which had a slightly higher dynamic level of 44 decibels but an extended dissipation or decay of 300 milliseconds.

Kenneth William Marr, a forensic FBI audio examiner, reviewed the audio tape and testified that although he could identify 27 impulse sounds recorded on the audio, none of his testing could identify which weapon fired first.[9] He said the quality of

9. Mr. Marr stated that he conducted four tests of the original recording: critical listening,

the recording was not sufficient to determine, with any certainty, who fired first.

The Appellant took the stand in his own defense. At the time of trial, he was 69 years old and retired. He acknowledged that he and Carpenter had their differences but stated that he never believed "it would come to that," referencing the events leading up to and including the shooting. The first time he saw Carpenter that day was at 5 o'clock in the afternoon, when he saw Carpenter on his security monitors at the end of Appellant's driveway moving the disputed log. When Appellant didn't see anyone on the monitor, he drove down to the end of his driveway to move the log and rocks. He had a rifle in his trunk because he already had two previous encounters with Carpenter and he was aware that Carpenter was carrying a gun. Carpenter approached him while he was working in the ditch and started arguing with him. While he was on his way out of the ditch and to the car, he was arguing with Carpenter. At that point Carpenter pulled a 9mm handgun out of his pocket. The Appellant thought Carpenter was just trying to scare him and, at the time, did not believe Carpenter would shoot. The Appellant was only carrying gloves and car keys. He was easing over to his trunk when Carpenter shot him in the hip. He fell down and had to get back up to get into the trunk of the car. Carpenter also shot the Appellant in the arm. Carpenter continued shooting and ran up to the ditch line before he stopped shooting momentarily.

Appellant testified that he was afraid that Carpenter was reloading. He had never seen Carpenter act that way and he felt like he had no other choice than to return fire, as he had already been shot twice. After returning fire, he got back into his car and drove up his driveway home, where he then called "911." He remembered talking to a detective at the hospital but he indicated that he was in immense pain and was heavily medicated.

## Directed Verdict

■ The Appellant argues that there was insufficient proof to support his conviction for murder and therefore that the trial court erred in denying his motion for a directed verdict. The Commonwealth argues that this issue is not preserved. In light of, in particular, the testimony of Shirley Hudson, there was clearly sufficient evidence from which a reasonable juror could find Appellant guilty of murder. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). As no error occurred, we need not address the arguments regarding preservation.

## Prosecutorial Misconduct

■ The Appellant next argues that certain conduct of the Commonwealth Attorney during cross-examination of the Appellant amounted to reversible prosecutorial misconduct, including: the admission of allegedly irrelevant testimony concerning a prior property dispute with Carpenter; statements made by the prosecutor during cross-examination of the Appellant concerning the prosecutor's personal opinion of the "duties" of neighbors; a line of questioning by the prosecutor which suggested that the Appellant had a duty to retreat when confronted by Carpenter on Appellant's property; and the prosecutor's overall demeanor.[10] In the above instanc-

---

high wave resolution wave form, spectrographic, and narrow band spectrum.

**10.** The Appellant also alleges prosecutorial misconduct based on an objection by the prosecutor to "hearsay". During cross-examination, the prosecutor asked the Appellant, at least twice, how he knew that Carpenter was going to tear up his security equipment. The

es, Appellant's trial counsel made timely objections to the alleged misconduct, but the objections were summarily overruled by the trial judge. Having reviewed the record, we conclude that the prosecutor's conduct was improper.

 Prosecutors have a special role in the judicial system. Unlike other attorneys, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." *See* Model Rules of Prof'l Conduct R. 3.8 cmt. 1. The sovereign, represented in a criminal trial by the prosecutor, has an interest "not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Although the Commonwealth is granted latitude in presenting its argument and raising objections, the prosecutor must nonetheless "stay within the record and avoid abuse of defendants and their counsel." *Whitaker v. Commonwealth,* 298 Ky. 442, 183 S.W.2d 18 (1944). "While it is the duty of the prosecutor to advance the Commonwealth's case with persuasiveness and force, he or she has a concomitant duty not to derogate from a fair and impartial criminal proceeding." *Commonwealth v. Mitchell,* 165 S.W.3d 129, 132–33 (Ky. 2005).

The prosecutor in this case engaged in conduct unbecoming of his position of authority as a "minister of justice," who must not derogate from a fair and impartial trial, who must stay within the record, and avoid the abuse of defendants and their counsel.

The Appellant objected to a line of questioning which he argues implied that he had a duty to retreat when Carpenter confronted him on his property. Although the prosecutor did not state explicitly that the Appellant had a duty to retreat when confronted by Carpenter, there were several instances during cross-examination which certainly created that impression, including but not limited to the following exchanges:

Prosecutor: Sir, when you went down there and moved that log ... **Why didn't you get right back in your vehicle and drive back up this hill?**

. . . .

Prosecutor: **Yeah, and there was nothing that prevented you from getting into your car and driving home, was there?**

Appellant: I tried to.

Prosecutor: You're telling us that you actually went up and tried to get in your car and drive away?

Appellant attempted to answer this question each time by testifying that Carpenter had previously threatened to tear up the security equipment as soon as he got his tractor working. Each time, the prosecutor objected, arguing that this testimony was hearsay. Each time, the trial judge sustained the objection and admonished the Appellant. After the second occasion, the trial judge also admonished the jury at the request of the prosecutor. We note for the sake of clarity, that this testimony would have been, in fact, a nonhearsay use. The statement was not offered as proof of the matter asserted (that Carpenter had in fact torn up the security equipment), but rather the statement was being offered to prove the state of mind of the person who heard it (that the Appellant was afraid Carpenter would tear up the equipment). *Perdue v. Commonwealth,* 916 S.W.2d 148, 156 (Ky.1995). Despite the trial judge's erroneous ruling and the prosecution's insistence that this testimony was hearsay, because we find that the other instances of misconduct rise to the level of reversible prosecutorial misconduct, we need not address this evidentiary issue any further than to note that, on retrial, should the prosecution again inquire of the Appellant as to how he knew that Carpenter was going to tear up his security equipment, the Appellant's testimony concerning Carpenter's threat would be admissible.

Appellant: I got to the trunk of the car, opened the trunk up, put my gloves in there, and that's when he started shooting.

Prosecutor: So, if you're ... If you are so afraid of this man, and he's coming at you with a gun, why in the devil do you take time to open a trunk, take your gloves off, put them in the trunk ... **Why aren't you hightailing it for the passen— for the driver's seat?** ... Why not?

Appellant: I was getting in the car. I told him plainly, don't come any closer to me, three times on that tape ... and I was getting

Prosecutor: Yeah, (interrupting) that's right. And **instead of staying there saying "don't come closer to me" nothing prevented you** ...

. . . .

Prosecutor: You took time to yell at him, didn't you? You took time to curse at him.

Appellant: He was doing the same to me.

Prosecutor: Sir, he ain't here to speak for himself and I understand that. I heard it plainly. But you took time to curse at him and to talk to him, yell at him. **Instead of getting straight in that car and driving up the hill, didn't you?**

. . . .

Prosecutor: If you were concerned about him coming out **why not just go on, get in the car, and drive home?**

Emphasis added.

Appellant's counsel objected on three occasions during this line of questioning. In the first two instances, the trial judge summarily overruled the objections before counsel could argue the merits of his objections. Appellant's counsel objected a third time, which was, once again, quickly overruled. At that point, counsel stated, "Your honor, I would like ... to make my objection." The trial judge conceded and held a bench conference. Appellant's counsel explained that he was objecting to the prosecutor's line of questioning because there was no legal requirement or duty for the Appellant to retreat. The trial judge simply stated in response that "the Commonwealth has a right to cross-examine him."

The prosecutor's repeated questions to the Appellant demanding, "Why not just go on, get in the car, and drive home?" could certainly have suggested to the jury that the Appellant had a duty to retreat. Moreover, the trial judge overruled Appellant's objections, allowing this line of questioning to continue for *over fifteen minutes,* permitting the prosecution's suggestion that the Appellant should have retreated to his home to be strengthened by implicit judicial approval. The prosecution's line of questioning stands in stark contrast to the law. KRS 503.055(3) provides:

A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

*See also* KRS 503.050(4); KRS 503.070(3); KRS 503.080(3).

Where the prosecution's case, and the Appellant's liberty, turn on the jury's determination of which man was the initial aggressor and "who fired first," creating the erroneous impression, strengthened by

implied judicial approval, that the Appellant was acting wrongly or illegally by remaining *on his property* when approached by Carpenter is highly prejudicial and improper. The trial judge should have corrected this error with an appropriate admonishment to the jury that the law does not require a person to retreat when he or she is attacked in a place where he or she has a right to be.

The next instance of misconduct occurred early in the course of the Commonwealth Attorney's cross-examination of the Appellant, when he began inquiring into the history of the property dispute between the Appellant and Carpenter and about Appellant's feelings toward Carpenter.[11] In response, the Appellant freely acknowledged that he and Carpenter had not ever gotten along. The Appellant then stated rhetorically, "I don't think you have to get along with your neighbors, do you?" The prosecutor seized this opportunity to expound his own personal philosophy to the court room, opining that:

> Yes sir, I think you should get along with your neighbors. Absolutely I think you should get along with your neighbors. I think you should go the extra mile to get along with your neighbors. I certainly don't think you should take a gun out every time you see your neighbors.

In its brief, the Commonwealth argues that the prosecutor was entitled to question the Appellant about any feelings he had toward Carpenter because "motive is a relevant issue in a murder prosecution." Be that as it may, the prosecutor's monologue about his personal view of appropriate neighborly behavior fell outside the scope of proper cross-examination. When he made this comment, the prosecutor was no longer conducting legitimate cross-examination. He was, in effect, testifying. *See Moore v. Commonwealth,* 634 S.W.2d 426, 438 (Ky.1982) (prosecutor's personal opinion is not relevant and not proper); *see also Chipman v. Commonwealth,* 313 S.W.3d 95, 101 (Ky.2010) (citing *Miller v. Commonwealth,* 283 S.W.3d 690, 695 (Ky. 2009)) (arguments of counsel are not evidence). While the prosecutor's comment was intended to rebut Appellant's statement, it was argument for argument's sake and was not supported by facts in the record. To effectively testify during cross-examination was improper.

Furthermore, we note that the prosecutor's overall demeanor during cross-examination was, at times, demeaning and teeming with sarcasm. For example, the prosecutor asked the Appellant, "So what, did a little birdie tell you that you was going to see him?" and, "Did he have eyes in the back of his head?" On yet another occasion, after the Appellant testified that

---

11. Appellant's trial counsel objected to this line of questioning on the basis that the trial judge had previously ruled that the issue of who owned the property was irrelevant; however, the trial judge overruled, stating that it was cross-examination and the Appellant had "opened the door." It is difficult to see from the record in what manner the Appellant could have "opened the door" to this line of questioning—especially when, earlier in the trial, the trial judge prevented the Appellant from introducing evidence proving his ownership of the property. At that time, the trial judge explained that "it did not want to get into litigation of who owns what property."

The effect of these two apparently contradictory rulings was to prohibit the Appellant from presenting potentially favorable evidence in support of his claim that he was the lawful owner of the disputed property and that Carpenter was without a reasonable basis to support his claim to the disputed property, while at the same time, permitting the prosecutor to ask questions of the Appellant which insinuated that the Appellant lost in court on the merits of his claim to the property or that Carpenter was justified in his actions toward Appellant. On retrial, the trial judge should not again put the Appellant is this paradoxical position.

he did not remember everything that he said at the hospital because he was "in and out of it" due to immense pain and pain medications, the prosecutor responded by saying sarcastically, "Oh, I'm sure," and later, "So, let's see if there is anything else in here you was 'out' on." Although the Appellant's trial counsel did not object to each and every instance where the prosecutor was being rude or condescending, when he did object, his objections were largely summarily overruled.[12] We agree that the prosecutor's sarcasm and general demeanor in this case did not befit the "mantle of power and respect" entitled to the office of a Commonwealth's Attorney, "one of the finest offices the public can give to a member of the legal profession in this state." *Niemeyer v. Commonwealth*, 533 S.W.2d 218, 222 (Ky.1976), *overruled on other grounds by Blake v. Commonwealth*, 646 S.W.2d 718 (Ky.1983). This is especially true in light of the fact that the prosecutor did not treat any other witness, whether on direct, cross or redirect examination, with the same degree of rudeness, contempt or sarcasm. We need not, however, address whether any objection to the prosecutor's behavior was, in each instance, properly preserved, as we find other instances of reversible prosecutorial misconduct which were properly preserved on appeal.

As we have determined that the prosecutor's conduct in the above enumerated instances was improper, we must next determine what, if any, relief is warranted. This Court has held that "[a]ny consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the entire trial." *Partin v. Commonwealth*, 918 S.W.2d 219, 224 (Ky.1996), *overruled on other grounds by Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky.2008). We reverse for prosecutorial misconduct only if the misconduct is "flagrant" *or* if each of the following three conditions is satisfied:

(1) Proof of defendant's guilt is not overwhelming;

(2) Defense counsel objected; and

(3) The trial court failed to cure the error with a sufficient admonishment to the jury.

*Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky.2002) (citing *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir.1994); *United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979)).

As in *Barnes*, we need not decide whether the misconduct was "flagrant" because each of the above three conditions was met in the present case. 91 S.W.3d at 568. In the present case, Appellant's trial counsel objected to the above-enumerated acts of misconduct and the trial court overruled the objections, thereby precluding the ability to cure the error with a sufficient admonishment to the jury. Thus, the second and third conditions have been met. Moreover, the proof of Appellant's guilt was not overwhelming. The evidence was conflicting on certain key issues, there were varying accounts by several eye-witnesses, and there was conflicting expert testimony. Depending on which version of the facts jurors believed, more than one legal conclusion could have been drawn. When a prosecutor, bolstered by his or her authority, misstates the law, the result may be juror confusion or worse, a miscar-

12. Regarding the single instance where the objection by Appellant's counsel was sustained, when the prosecutor sarcastically asked the Appellant if Carpenter "put the death stare" on him, Appellant's counsel requested no further relief. When no further relief is requested, the error is unpreserved for appellate review. *Taylor v. Commonwealth*, 449 S.W.2d 208, 209 (Ky.1969).

riage of justice. Accordingly, we deem the prosecutorial misconduct in this case to be reversible error.

## Conclusion

The judgment of the Breathitt Circuit Court is hereby reversed as to the Appellant's convictions for murder and three counts of wanton endangerment, and remanded for further proceedings consistent with this opinion.

All sitting. All concur.