## Petty v. Commonwealth.

(Decided December 21, 1917.)

### Appeal from Warren Circuit Court.

1. Homicide—Evidence—Dying Declaration—Admissibility.—On a prosecution for homicide, the dying declaration of the deceased is not rendered admissible by the statement of the attending physician to the deceased that something might happen; there being no statement nor conduct of the deceased, nor other circumstances from which it could be inferred that the declaration was made under a sense of impending death.

2. Homicide—Evidence—Dying Declaration—Admissibility—Error.— On a prosecution for homicide, the improper admission of a dying declaration made by the deceased to a reputable physician, although a similar declaration was made two days later to the mother of the deceased, was prejudicial error in view of the fact that the jury might not have believed the testimony of the mother, because of her personal interest in the matter, had it not been corroborated by the testimony given by the physician, who had no other motive than to tell the truth.

D. W. WRIGHT and GEO. H. GALLOWAY for appellant.

CHARLES H. MORRIS, Attorney General, and D. M. HOWERTON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMMISSIONER—Reversing.

Porter Petty was convicted of manslaughter and prosecutes this appeal to obtain a reversal of the judgment.

The facts are as follows: Petty, who is a negro about 22 years of age, was employed as janitor at the St. James apartment house in the city of Bowling Green, and occupied a room in the basement. He and Dave Duncan, another negro, who lived about a block and a half away, were rivals for the affections of Mary West. Mary spent the night preceding the homicide with Petty in his room in the basement of the apartment house. As she left the next morning about five o'clock, she met the deceased, Dave Duncan. Dave said, "I caught you." She replied, "You didn't catch me doing anything." Dave said, "That is all right; I am not mad at you; you told me all the time you were going there and I didn't believe it." The deceased, after going down the street a short distance, returned and went toward the apartment house. When Mary last saw him, he was near the gate leading to the apartment house. Shortly thereafter, he was shot

twice by Petty and died from the wounds about two days later.

According to the dying declaration of the deceased, Petty shot him before he got into the house and without any provocation therefor. On the contrary, Petty states that the deceased entered his room without his knowledge and immediately assaulted him with a knife and cut his vest. After endeavoring to push the deceased away, he reached for a pistol on a table nearby and shot the deceased twice for the purpose of saving his own life. Immediately after the difficulty, he exhibited his vest to a witness living in the house. There was further testimony by the Commonwealth that no knife was found on the deceased or nearby, and that the knife owned by the deceased was in the possession of his father.

The principal ground urged for a reversal is the error of the trial court in admitting the alleged dying declaration made by the deceased to the attending physician, Dr. Z. K. Jones. It appears that Dr. Jones called to see the deceased about seven o'clock on the morning of the homicide. The only conversation he had with the deceased with reference to the circumstances attending the homicide occurred at that time, and the deceased stated that when he went to the St. James apartments to see Petty and started in the door, Petty immediately began shooting at him. Dr. Jones claims that the deceased realized the seriousness of his condition and that he told the deceased that the wound might prove to be fatal, yet when asked to tell precisely the conversation that occurred he testified as follows:

"I told him, 'Dave, you had better tell me how it happened,' and he said he didn't want to talk, and I said, 'This is a serious thing and something might happen to you,' and he says, 'I will tell you,' and I said to Horace to go get me some hot water and then he told me."

It must be remembered, that the admission of a dying declaration in any case is an exception to the general rules of evidence. Therefore, to bring into operation this exceptional rule it must appear that the declaration was made in extremity, when the person was at the point of death, and when every hope of recovery was gone, every motive to falsehood was silenced, and the mind was induced by the most powerful considerations to speak the truth; a situation so solemn is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice. R. C.

L., page 537, section 80; Tibbs v. Commonwealth, 138 Ky. 558, 128 S. W. 871, 28 L. R. A. (N. S.) 665. Although it is essential to the admissibility of a dying declaration that it be made under a sense of impending death, it is not absolutely necessary that the declarant express in so many words, his apprehension of such death. It is enough if it satisfactorily appears in any mode that the declaration was made under that sanction whether it be directly proved by the express language of the declarant, or be inferred from his evident danger or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of his mind. R. C. L., page 545, section 92. Here it does not appear that the deceased used any expression tending to show that he believed death was pending. The attending physician did not so advise him, but merely stated that something might happen. Nor did the deceased make any preparations for death or otherwise indicate by his conduct that he had abandoned all hope of recovery; nor were there any circumstances whatever tending to show that the statement was made under the sense of approaching dissolution. It is clear, therefore, that the preliminary proof offered by the Commonwealth to show that the declaration was made under a sense of impending death, was not sufficient, and that the declaration should not have been received in evidence.

But the point is made that the admission of the declaration to Dr. Jones was not prejudicial, because two days later the deceased made a similar declaration to another witness. It must be remembered, however, that the other witness was the mother of the deceased, who had a personal interest in the matter, and the jury might not have believed her statement of what her son said to her, had it not been corroborated by the testimony of Dr. Jones, a reputable physician, who was actuated by no other motive than the desire to tell the truth. Viewing the question in the light of this fact and of certain circumstances tending to show the deceased was prompted by jealousy to go to appellant's room for the purpose of attacking him, we conclude that the admission of the dying declaration as detailed by Dr. Jones, was prejudicial error.

Judgment reversed and cause remanded for a new trial consistent with this opinion.