# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: SEPTEMBER 18, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0192-MR

JOSHUA COTTON                                                          APPELLANT

V.
ON APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JOHN L. ATKINS, JUDGE
NO. 22-CR-00190

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**REVERSING IN PART AND REMANDING**

Joshua Cotton was convicted of murder and sentenced to 45-years' imprisonment after a two-day trial. Cotton now appeals his conviction and sentence as a matter of right.[1] On appeal, Cotton alleges six claims of error: (1) improper admission of the victim's identification of Cotton as the shooter; (2) improper testimony by a law enforcement witness; (3) improper admission of gruesome autopsy photos; (4) prosecutorial misconduct; (5) failure to consider probation at sentencing in violation of the youthful offender statutes; and (6) cumulative error. Finding the trial court erred in failing to consider probation as a possible sentence, we reverse and remand for resentencing.

---

[1] Ky. Const. § 110(2)(b).

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 2, 2022, Alijah Watts was shot in the abdomen as he sat in his vehicle in front of a convenience store in Hopkinsville, Kentucky. His consciousness fading after the shooting, Watts attempted to drive away, but was unable to maintain his awareness and his vehicle crossed an intersection, striking two cars and coming to rest in some bushes at the side of a home. Officers encountered Watts in the vehicle, barely conscious. To keep Watts awake, officers engaged him in conversation, the conversation eventually turning to the identity of Watts's assailant. Watts was able to answer the question, telling officers it was Cotton, whom Watts knew from the neighborhood, and who did not like Watts. Emergency medical services arrived in short order and transported Watts to the hospital. Sadly, Watts died from the gunshot injury while en route.

Detective Keith Flick began investigating the homicide. He obtained security footage from the convenience store that viewed the scene and also an insurance company next door. That footage revealed the driver of another car had exited his vehicle and entered Watts's car. After the driver left Watts's car, two additional men approached the car from behind the store and then fled on foot. The two men on foot later rendezvoused with the driver of the other car, and all three left the scene in the other vehicle.

Local law enforcement posted a picture of the driver on their Facebook page seeking an identification. An anonymous tip identified the driver as Christian McKeel. McKeel was arrested and promptly confessed, naming

2

Cotton and a third person, Johnathan Weston, as members of the conspiracy. Weston and Cotton lived together and were half-brothers. Weston, too, promptly confessed, and confirmed what McKeel told law enforcement. Cotton was a juvenile, so police contacted the court designated worker and requested a pickup order.

Police also obtained a search warrant for the apartment where Cotton and Weston had been staying. The owner of the apartment told police the pair had left some items in the apartment that the owner did not want around. In the apartment, officers located a blue lockbox and when Weston was arrested, he was in possession of the key. The lockbox contained a .40 caliber handgun with a shell casing lodged in the gun's slide. Detectives surmised the shell casing may have become jammed when a hand, presumably Watts's, blocked its ejection.

Officers confirmed McKeel and Weston's confessions, and by the time Cotton's trial began, the two had already resolved their cases. Cotton was tried before a jury over a two-day period, the details of which will be expanded upon below as needed. Generally, however, Cotton did not deny his involvement in the crime, but argued that he did not intend to kill Watts, only to rob him. The jury found Cotton guilty of murder and recommended 45-years' imprisonment, which the trial court imposed.

## ANALYSIS

Cotton alleges six points of error in his appeal. First, he argues the trial court erred by admitting Watts's hearsay identification of Cotton as the shooter

3

as a dying declaration. Second, he contends some statements made by Detective Robert Stucki, most notably those relating to dying declarations and Cotton's invocation of his right to remain silent, rendered the trial unfair. Third, Cotton argues the trial court erroneously allowed the admission of gruesome autopsy photos that prejudiced the jury against him. Fourth, Cotton finds issue with some statements made by the prosecutor, specifically those relating to general crime statistics in Hopkinsville, Cotton invoking his right to silence, and Cotton's co-defendants taking responsibility for their actions by accepting plea deals. Fifth, Cotton alleges the trial court erred in failing to consider probation during sentencing in contravention of the violent youthful offender statute and *Thomas v. Commonwealth*, 605 S.W.3d 545, 547-48 (Ky. 2020), *abrogated on other grounds by Abbott, Inc. v. Guirgus*, 626 S.W.3d 475 (Ky. 2021). Finally, in the event that no one issue creates error sufficient to warrant reversal, Cotton asks us to reverse based on the cumulative effect of any errors we identify. We take each argument in turn.

## I. Alijah Watts's statement was properly admitted.

Cotton first argues that the trial court erred in admitting one of the most damning pieces of evidence against Cotton: the victim's identification of him as the shooter. Prior to his death, Watts affirmatively named Cotton as the perpetrator and briefly described their relationship acrimoniously. That statement was admitted at trial under the dying declaration exception to our hearsay rule. Cotton contends this was error because at the time Watts made the statement, Watts was not "under a sense of impending death." *Turner v.*

4

*Commonwealth*, 5 S.W.3d 119, 122 (Ky. 1999) (quoting *Petty v. Commonwealth*, 178 Ky. 483, 485, 199 S.W. 20, 21 (1917)). This alleged error is preserved and so we review for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018). Under this standard we reverse only if "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (quoting *Lopez v. Commonwealth*, 459 S.W.3d 867, 872-73 (Ky. 2015)). We ultimately hold the statement was a dying declaration properly admitted under KRE[2] 804(b)(2).

Hearsay, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," KRE 801(c), is generally inadmissible. KRE 802. However, where, as here, the declarant is unavailable, our rules provide a number of exceptions to the general rule. KRE 804(b). Among those exceptions is the "statement under belief of impending death," or, as it is more colloquially known, the dying declaration. KRE 804(b)(2). Such statements are "made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be his impending death." *Id.*

> The proponent of a dying declaration need prove only three elements: (1) the declarant is unavailable as a witness as that term is defined in KRE 804(a); (2) the declaration was made at a time when the declarant believed that his death was imminent; and (3) the declaration concerned the cause or circumstances of what the declarant believed to be his impending death.

---

[2] Kentucky Rules of Evidence.

5

*Turner*, 5 S.W.3d at 121. (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.40, at 412–14 (3d ed. Michie 1993)). Here, the controversy centers upon the second element, whether Watts was aware of his imminent death. If Watts was aware that he would soon die from the gunshot to his abdomen, then the statement was admissible. If Watts believed he would live, then the statement was not a dying declaration.

As Lawson writes, the "core component" to the exception has been set forth by the U.S. Supreme Court thusly: "'There must be a "settled hopeless expectation". . . that death is near at hand, and what is said must have been spoken in the hush of its impending presence. . . . The patient must have spoken with the consciousness of a swift and certain doom.'" Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.40, at 777 (2024 ed. LexisNexis Matthew Bender 2024) (quoting *Shepard v. United States*, 290 U.S. 96, 100 (1933)). "In most of the cases in which statements have been admitted as dying declarations, the declarant either expressed a belief in his impending death, . . . or a witness testified that the declarant had been told that he was going to die." *Turner*, 5 S.W.3d at 122 (citations omitted). But the declarant need not make explicit his belief that he is soon to die, nor have it explained to him; rather, "a declarant's belief in his own impending death can be inferred from circumstantial evidence." *Id.* (citing *Wells v. Commonwealth*, 892 S.W.2d 299, 302 (Ky. 1995)); *see Shepard*, 290 U.S. at 100 ("Despair of recovery may indeed be gathered from the circumstances if the facts support the inference.

6

There is no unyielding ritual of words to be spoken by the dying." (citation omitted)).

> It is enough if it satisfactorily appears in any mode that the declaration was made under [a sense of impending death], whether it be directly proved by the express language of the declarant, *or be inferred from his evident danger* or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of his mind.

*Turner*, 5 S.W.3d at 122 (quoting *Petty*, 178 Ky. at 485, 199 S.W. at 21).

*Turner* illustrates how a sense of impending death can be inferred from the circumstances in the absence of either a statement from the victim to that effect or evidence that the victim was told he would soon be dead. There, Bill Turner (the father of Joe Turner, for whom *Turner* gets its name) was found severely beaten in an apartment in Scottsville, Kentucky. He arrived conscious at the emergency room, and while there an officer asked who had assaulted him, to which Turner replied, "my son, Joe." Turner was transferred to another hospital, but died shortly after from his injuries. Our opinion makes no mention of Turner expressing his belief in his imminent death, or of anyone telling him that he would soon be dead.

At trial, several witnesses testified to the severity of Turner's injuries. The officer who found Turner saw him covered in blood and did not believe Turner would survive. A nurse at the first hospital testified to the severity of the injuries and also to her belief that when Turner identified his son as his assailant, he would have been aware that he would soon be dead. Finally, the doctor who performed Turner's autopsy testified at the KRE 104(a) hearing that

7

"[his] opinion is that it is more likely than not that a person who received the injuries that [he] observed both during the autopsy and from reviewing the medical records would have felt that his death was imminent." *Turner*, 5 S.W.3d at 121. Taken together, all of this "was sufficient to support the trial judge's finding that when Bill Turner identified Appellant as his assailant, he believed that his death was imminent." *Id.* at 122.

The context of the final moments of Watts's life also support an inference that Watts would have believed that he would soon be dead. Watts was shot in the abdomen. Although the wound produced very little blood, Watts experienced significant internal bleeding that ultimately led to his death. Although he would have been unaware of the bleeding itself, symptoms of such blood loss would have been equally alarming. Specifically, the wound caused him to begin to slip in and out of consciousness, resulting in his crashing his car into two other vehicles before it came to a rest in the yard of a nearby residence. When officers found Watts, he was awake, but again frequently losing consciousness. Only after officers roused him were they able to elicit the identification of Cotton as the shooter. At other times, Watts was disoriented and unsure of where he was. Although EMS rushed him to the hospital within 15 minutes, Watts did not survive the journey. Dr. Christopher Keefer, a forensic pathologist for the Commonwealth, testified as to the extensive internal bleeding that quickly led to Watts's death.

Taken together, we do not find error in the trial court's conclusion that the identification was made as Watts believed his death was imminent. When

8

he identified Cotton, Watts, in that moment of lucidity, was aware at minimum that he had been shot and perhaps that he was losing consciousness. Whether or not in this state he could form a coherent assessment of his condition is unclear, but we do not begrudge Watts for being unable to keep his wits about him after being shot in the abdomen and crashing his car. Were we to do so, we would undermine the dying declaration exception in cases such as this where a victim with clearly life-threatening injuries, is in a mental state that impedes self-assessment. In all, then, Watts was sufficiently aware of the severity of the injury to him, officers who attended to him after the crash were aware of his rapidly fading degree of consciousness, and the forensic pathologist testified to the critical nature of the wound Watts sustained. Taken together, the context in which Watts made his declaration supports a finding that Watts was operating under a sense of his impending death. The statement was therefore properly admitted.

## II. Det. Stucki's testimony was not improper.

Cotton's second claim of error arises from alleged improper testimony given by Det. Stucki. Cotton identifies four instances where in his view Det. Stucki's testimony veered into impermissibility. The first and second are instances where Det. Stucki stated that one witness confirmed the statement of another. The third involves Det. Stucki's defining "dying declaration" for the jury. And the fourth involves a reference to Cotton's invocation of his right to remain silent as well as another instance of hearsay. The details of each statement will be elaborated upon below. The first two instances were objected

9

to and are preserved, thus we review for harmless error. *Carson v. Commonwealth*, 621 S.W.3d 443, 450 (Ky. 2021). "[E]rrors 'will be deemed harmless . . . if we can say with fair assurance that the judgment was not substantially swayed by the error.'" *Id.* (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010)). The third and fourth instances are not preserved, so Cotton asks us to review the alleged errors for palpable error under RCr[3] 10.26. Under our palpable error standard, "an error is reversible only if a manifest injustice has resulted from the error. That means that if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006) (quoting *Graves v. Commonwealth*, 17 S.W.3d 858, 864 (Ky. 2000)).

The first two statements are of a similar character and will be treated together. When discussing Det. Stucki's conversations with Cotton's co-defendants, Det. Stucki stated,

> Prosecutor: Did you have, based on your investigation and based on what you found, did you have an inkling to believe that they were together during that day and time, sir?
>
> Det. Stucki: I had an inkling, but I had no way to move forward with it until we did speak with Mr. McKeel.
>
> Prosecutor: And once you spoke to Mr. McKeel, the inkling became?
>
> Det. Stucki: Yeah, it became a surety, became-
>
> Defense Counsel: Objection, Judge, it's going down hearsay.

---

[3] Kentucky Rules of Criminal Procedure.

10

Trial court: Overruled.

Prosecutor: Based on the conversation you had with Mr. McKeel, did it lead to other suspects?

Det. Stucki: It led to Mr. Weston.

Prosecutor: Okay, and then once you spoke with Mr. Weston, did that lead to another suspect or confirmation?

Det. Stucki: Mr. Weston confirmed what Mr. McKeel had said.

Later, Det. Stucki stated the co-defendants confirmed the substance of Watts's

dying declaration:

Prosecutor: So everything that you had been told from that point was related to the dying declaration, is that correct?

Det. Stucki: That's correct.

Prosecutor: Okay, now dying declaration led to other information, other people to actually confirm-

Defense Counsel: Judge, objection. If she wants to call McKeel and Weston, she can.

Prosecutor: I understand that, Judge. I'm asking that Mr. Detective Stucki, what led him to arrest Joshua Cotton, so there's clarity provided in this case because so much is at stake regarding Mr. Cotton's life and also the victim.

Trial Court: Overruled.

Prosecutor: So the information that you obtained from the dying declaration led you to McKeel who also confirmed the dying declaration who also, which led you also to the blue box here with the gun with a gun in there with the magazine and the bullets where the keys were found on Mr. Weston, the codefendant. Is that correct?

Det. Stucki: Mostly. It didn't lead to Mr. McKeel. The investigation followed the trails of the location and the dying declaration. All the evidence and interviews that we conducted did corroborate the dying declaration. Then, yes, ma'am, it did lead us to the location

11

where the homeowner acknowledged that Mr. Weston and Mr. Cotton had been there previously and had left the items there. We did eventually take them into custody and Mr. Weston did have the keys to that safe [blue lockbox] on his person.

Cotton's point of contention with these statements is that when Det. Stucki stated that Weston confirmed the statements of McKeel or that Weston and McKeel's statements both corroborated Watts's dying declaration, he introduced impermissible hearsay. The Commonwealth counters by arguing the statements fall within the verbal act doctrine. We agree with Cotton, but hold the statements were harmless.

Hearsay is a concept well known in the legal community, from the neophyte to the seasoned professional. As our rules define it specifically, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). Prior to the promulgation of our rules of evidence, frequent reference was made to the concept of "investigative hearsay," an apparent exception to the hearsay prohibition for statements made to law enforcement officers. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.90[4], at 907 (2024 ed. LexisNexis Matthew Bender 2024). Although this exception has at no time been recognized by this Court, it has proven difficult to eradicate. *See Ruiz v. Commonwealth*, 471 S.W.3d 675, 680-81 (Ky. 2015) ("Lest our repetition of the term 'investigative hearsay' be misconstrued, we state here without equivocation: there is no such thing in our jurisprudence as 'investigative hearsay.' There is no special rule of evidence known as 'investigative hearsay.' The term simply is not a part of the evidentiary

12

lexicon."). Perhaps some confusion arises from our acceptance of the verbal act doctrine, which may look like investigative hearsay and talk like investigative hearsay, but is not the same as that much discredited concept.

The fundamental difference between impermissible investigative hearsay and the permissible verbal act doctrine is, "[a]n extrajudicial statement has a proper nonhearsay use when its utterance (not its substance) is a part of the issues of the case." *Brewer v. Commonwealth*, 206 S.W.3d 343, 351 (Ky. 2006) (quoting *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky. 1988) (plurality opinion), *overruled on other grounds by Hudson v. Commonwealth*, 202 S.W.3d 17, 22 (Ky. 2006)). Under the doctrine, otherwise impermissible statements can be admitted so long as they are,

> "not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place." [*Preston v. Commonwealth*, 406 S.W.2d 398, 401 (Ky. 1966)]. Importantly, however, the "relevancy [of such statements] does not turn on whether the information asserted tends to prove or disprove an issue in controversy, but on whether the action taken by the police officer in response to the information that was furnished is an issue in controversy.... The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case." [*Sanborn*, 754 S.W.2d at 541.]

*Brewer*, 206 S.W.3d at 351-52. Accordingly, to determine whether Det. Stucki's testimony falls under the verbal act doctrine, we must assess whether the hearsay statement tends to explain an action Det. Stucki took and whether that action is an issue in the case.

In the first statement, when Det. Stucki discussed Weston's confirmation of McKeel's statement, neither of whom testified at trial, he did so to explain the course of his investigation. In that instance, no suggestion of what was being confirmed was given, such that Det. Stucki's report of Weston's confirmation exists on the very outskirts of hearsay generally. But, because the content of the confirmed statement is unknown, we are unable to say it was being offered for anything other than to explain the actions of Det. Stucki in investigating the shooting.

The second statement presents a different issue. There, Det. Stucki testified that Weston and McKeel corroborated a statement of which the contents were known to the jury, Watts's dying declaration. At this point in his testimony, Det. Stucki had already laid out the path of his investigation and the jury was aware how Cotton was reached only after interviews with other suspects. By testifying that Weston and McKeel backed up the dying declaration, Det. Stucki was indicating to the jury that the hearsay statements made by the co-defendant's were true and consistent with the Commonwealth's theory of the case; in other words, it was offered to prove the truth of the matter asserted, not to lay out the steps of the investigation.

As to the second part of the doctrine, both statements find the same conclusion. Cotton's defense at trial was not that he was innocent and that the police arrested the wrong man. Rather, Cotton acknowledged his role as the shooter, but disputed how the shooting occurred. Although the Commonwealth may have found setting out the path of the investigation played

14

a valuable narrative function for its case-in-chief, the investigation itself was not at issue. Because Cotton was not challenging the investigation, the verbal act doctrine does not apply and the statements remain impermissible hearsay.

Nevertheless, we find the error harmless in large part for the same reason we found the verbal act doctrine to not apply: Cotton conceded that he was the shooter. The impermissible statements went to the identity of the shooter, the very question that had been firmly established by Watts's dying declaration and by Cotton's defense at trial. Given that the hearsay would not have induced the jury to find anything that was not already established by other permissible evidence or by Cotton's own acknowledgment, the statements' erroneous admission was harmless.

We next address the unpreserved claims. First, Det. Stucki's definition of "dying declaration" to the jury:

> Prosecutor: Okay, and I know that this may be a legal term but and most people may know this but just in case they don't, when you say dying declaration, can you explain what a dying declaration is, sir?

> Det. Stucki: When someone is in a situation where they believe they might be dying, courts have recognized that they're much less likely to be lying under those circumstances. The circumstances that their life is ending gives credence to what they're saying.

Although Det. Stucki's definition generally captured the concept behind why courts permit an exception to the hearsay rules for dying declarations, the rationale behind the law is not an appropriate way to frame the declaration before the jury. Couching his investigation of the dying statement within the legal framework allowed Det. Stucki to impermissibly bolster the value of

15

Watts's declaration to the jury. In essence, Det. Stucki told the jury that, as a matter of law, the jury should place more weight upon the dying declaration than perhaps they would have otherwise have been inclined to do. The recent opinions of this Court have taken a strong position against impermissible bolstering. *See, e.g., Boggs v. Commonwealth*, ___ S.W.3d ___, 2025 WL 1717814, at *7 (Ky. 2025) ("We have spoken strongly on this issue because we declared more than thirty years ago that 'the law in Kentucky [on improper bolstering] should be clear.'" (quoting *Hall v. Commonwealth*, 862 S.W.2d 321, 322 (Ky. 1993)). While the normal bolstering scenario involves one witness supporting the credibility of another, Det. Stucki's recitation of the dying declaration concept was of the same kind. By placing the imprimatur of the state upon the declaration—stating, "courts have recognized that they're much less likely to be lying under those circumstances"—Det. Stucki impermissibly vouched for the credibility of Watts.

Though the testimony may have been error, we do not hold that it was palpable error. Again, when we look to what was being bolstered, Watts's declaration that Cotton was the shooter, we find that any impermissible bolstering of that statement had little effect on the trial. Cotton did not contest his role as the shooter, so Det. Stucki's comment would have done little to establish what had already been conceded. In the context of the trial, the discussion of dying declarations did not amount to manifest injustice.

Finally, we address Det. Stucki's reference to Cotton's invocation of his right to remain silent:

16

> Det. Stucki: Mr. Cotton invoked his *Miranda* [*v. Arizona*, 384 U.S. 436 (1966),] rights and didn't answer any questions. Mr. Weston did confirm everything that we'd already been told to that point.
>
> Prosecutor: So everything that you had been told from that point was related to the dying declaration, is that correct?
>
> Det. Stucki: That's correct.

"In general, '[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody.'" *Manning v. Commonwealth*, 701 S.W.3d 478, 508 (Ky. 2024) (quoting *Hunt v. Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009)). However,

> not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his silence as a prosecutorial tool. The usual situation where reversal occurs is where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.

*Id.* at 508-09 (quoting *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983)).

In *Manning*, we found a witness's reference to the defendant's post-arrest silence to be acceptable where the comment was not made in response to a direct question and no attempt was made to draw attention to that silence. 701 S.W.3d at 509. Such is also the case here. Stucki's comment was made as the Commonwealth continued to establish the path of the investigation. The reference to *Miranda* was made in passing and not dwelled upon. The mention of Cotton's invocation of his *Miranda* rights, then, was not reversible error,

17

palpable or otherwise. To the extent the broader statement also contains impermissible hearsay similar to that already discussed, we will not find an error palpable where we have already found it harmless.

In sum, although some of Det. Stucki's testimony was given in error, those errors were either harmless or did not rise to the level of manifest injustice. We will not reverse Cotton's conviction on this issue.

## III. The autopsy photos were properly admitted.

Cotton next argues that the trial court erred in admitting two autopsy photos over Cotton's objection. Both photos partially depicted Watts's body in an attempt to illustrate the path of the bullet. The first shows the inside of the body after the ribs were cut through, and with the heart and lungs removed. A metal probe shows the direction of the bullet's path. The second photo is a closeup of the first, showing in detail the metal probe as it passes through a large vein and terminates at a large flat bone in the back of the pelvis. As before, this issue is preserved and so we review for harmless error. Because these photos come nowhere near the degree of gruesomeness required to find error as to their admission, we decline to reverse on this issue.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. As Cotton acknowledges, "prior decisions of this Court have generally approved of the admission of graphic photos," *Hall v. Commonwealth*, 468 S.W.3d 814, 822 (Ky. 2015),

18

though "such photographs are not *automatically* admissible." *Id.* at 823. But, in large part, "our case law has been interpreted as laying out a bright line rule that gruesome victim photos are per se admissible subject only to clearly delineated exceptions, such as when the body had been mutilated or has decomposed." *Id.* at 822-23.

Instances where we have found gruesome photos to have been improperly admitted are typically those where a plethora of images were shown to the jury. In *Hall*, for example, the Commonwealth sought to introduce 28 photos, many "depicting the same scene or subject merely from different vantage points" and "some photos were left displayed, and magnified, on the digital projector while testimony was elicited about details that did not concern the photos." *Burdette v. Commonwealth*, 664 S.W.3d 605, 617 (Ky. 2023) (discussing *Hall*). In addition, the photos were admitted as a group, with the trial judge neglecting to assess the merits of each image. *Hall*, 468 S.W.3d at 827.

The alleged error here is far from the situation presented in *Hall*. At trial, the Commonwealth sought to admit only four photos from the autopsy into evidence and Cotton objected to only the two described above. Though the photos were gruesome, they were no more gruesome than the autopsy photos we regularly allow to be admitted during trial. And the photos did assist the jury to understand how Watts was killed. As Cotton notes when discussing the dying declaration, the wound did not seem as serious on the outside as it actually was. There was an entry wound, but no exit wound, and very little

19

blood. The autopsy photos were useful in illustrating how the bullet was able to pierce a vein and cause the catastrophic internal bleeding that led to Watts's death. Though the second photo was largely duplicative, being a closeup of the first, it was nevertheless helpful in showing that otherwise invisible internal injury. Finally, we are satisfied that the trial judge gave due consideration to each photo and appropriately weighed its probative value against its prejudicial effect.

Lastly, although Cotton primarily describes this error as one related to prejudice, he also makes an argument as to their probative value. Although Cotton notes that the manner of Watts's death was never at issue, at its heart, this error is alleged to stem from what the Commonwealth asked the forensic pathologist to do after discussing the photos, to wit, stand and point on his body the path of the bullet. In Cotton's view, this demonstration was of far greater illustrative value than the photos, rendering their admission superfluous.

As we have already stated, the photos were indeed probative of the internal injuries Watts sustained when he was shot. We would add only that "the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see." *Pollini v. Commonwealth*, 172 S.W.3d 418, 424 (Ky. 2005) (quoting *Johnson v. Commonwealth*, 105 S.W.3d 430, 438–39 (Ky. 2003)). The value of the photos was not only in showing the trajectory of the bullet, but also in showing how that trajectory impacted Watts's body to

20

lead to his death. They were certainly unpleasant for the jury to view, but they were more probative than prejudicial. We hold the trial court committed no error in admitting the autopsy photos.

## IV. The prosecutor's statements did not create manifest injustice.

Next, Cotton argues that the prosecutor's improper statements or improper questions violated his right to a fair trial. Cotton identifies three instances of alleged prosecutorial misconduct: (1) the prosecutor's recitation of local crime statistics in her opening; (2) questioning that drew attention to Cotton's invocation of his right to remain silent; and (3) questions that drew attention to Cotton's co-defendants' willingness to take plea deals and take responsibility. Cotton did not make contemporaneous objections to the statements and asks us to conduct palpable error review under RCr 10.26. Accordingly, we review for manifest injustice, seeking an "error . . . so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Johnson v. Commonwealth*, 680 S.W.3d 814, 824 (Ky. 2023) (quoting *Brewer*, 206 S.W.3d at 349).

"Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017) (quoting *Commonwealth v. McGorman*, 489 S.W.3d 731, 741–742 (Ky. 2016)). "Prosecutorial misconduct may result from a variety of acts, including improper questioning and improper closing argument. 'Any consideration on appeal of alleged prosecutorial misconduct must center on the

21

overall fairness of the entire trial.'" *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011) (quoting *Partin v. Commonwealth*, 918 S.W.2d 219, 224 (Ky.1996)) (internal citations omitted). If we determine the prosecutor committed an act of misconduct, under our palpable error standard, we will only reverse if the misconduct was flagrant. *Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020). To aid our determination, we weigh four factors, "namely (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.*

We take each alleged incident of misconduct in turn. First is the prosecutor's opening statement which included the following:

> In 2021, the Hopkinsville Police Department responded or had 263 shots fired calls. 263 shots fired calls. In 2022, the Hopkinsville Police Department had 188 shots fired calls. Nineteen people were shot in 2022, fourteen people were shot in 2021. This year alone, as of the end of July, they've had over 133 shots fired calls. And out of those, thirteen people were shot.

> So, let's go back to 2022. Unfortunately in 2022, one of those nineteen people was Alijah Watts. On March the 2nd, 2022, at the Casey's General Store right there on Fort Campbell Boulevard, a shooting took place and it ended his life. He was only nineteen years old and what our evidence is going to show is that Joshua Cotton pulled the trigger to end his life.

> So, that's it. We're going to have officers to come and testify. You're going to hear from Alijah's own mouth who shot him because they asked him who shot him and he said Joshua Cotton. We have two other accomplices who were a part of that issue who are going to say it was Joshua Cotton who pulled the trigger. So, what we're looking at here is whether or not we're going to deem those 188 shots fired calls that our Hopkinsville Police Department had to respond to if we're going to take any more.

22

When the prosecutor provided crime statistics and then asked the jury, "if we're going to take any more," she engaged in "send a message" argumentation that we have long disapproved of. *See Benjamin v. Commonwealth*, 266 S.W.3d 775, 792 (Ky. 2008) ("It is true that this Court has repeatedly indicated that 'send a message' statements are improper in the Commonwealth and prosecutors should not engage in such argument."). However, though the statement may have been error, it is not necessarily reversible error. *Hall v. Commonwealth*, 551 S.W.3d 7, 19 (Ky. 2018). Under our palpable error standard, we will only reverse if the misconduct was flagrant.

Thus, we apply our four factors. As to the first, the remarks did prejudice Cotton to the jury. When the prosecutor asked the jury to make an example of Cotton as a sign that the community would no longer suffer gun violence, she asked the jury to convict him for reasons other than the evidence against him. To do so is undoubtedly prejudicial, and so that factor weighs in Cotton's favor. Second, in the context of the Commonwealth's opening statement, the remarks were extensive. The excerpted portion transcribed above constitutes two minutes of the roughly three-minute-long opening given by the prosecutor. Of that portion, only a little less than half was improper. This was an extensive share of the opening and so that factor also weighs in favor of Cotton. Third, the prosecutor clearly made the statement deliberately to the jury. The statement was not an off-the-cuff digression; these were

23

prepared remarks that formed the core of the opening statement. The third factor, then, also falls in Cotton's favor.

Finally, and perhaps most crucially, we reach the fourth factor: the strength of the evidence against Cotton. Cotton was positively identified as the shooter by the victim and was seen on the security recording walking in the direction of Watts's car with his co-defendants. McKeel was later seen picking up Cotton and Weston as the two left the scene. McKeel led police to Weston, and Cotton was staying with Weston at the time of the murder. Police located the lockbox in Weston and Cotton's residence and inside the safe was the gun police believed was used to shoot Watts. In short, the Commonwealth presented strong, nearly incontrovertible evidence that Cotton approached Watts's car with a gun, entered that car, drew the gun, and pointed it at Watts. The presence of a round stuck in the firearm's slide indicates a struggle for the weapon ensued and Watts was fatally shot. Although Cotton asks us to believe the jury had a choice between two options—intentional murder or manslaughter—the jury was also able to find Cotton guilty of wanton murder under the instructions as given. Whatever force there may be to Cotton's argument as to the establishment of the requisite *mens rea* for intentional murder, Cotton would be at pains to show how pointing a loaded gun at Watts with his finger on the trigger while in close proximity to the victim during a robbery would not constitute "wantonly engaging in conduct which created a grave risk of death to another and thereby caused the death of Alijah Watts

24

under circumstances manifesting extreme indifference to human life." The fourth factor, then, strongly favors the Commonwealth.

The weight of the evidence ultimately proves the deciding factor. While the factors guide the Court in its determination, we must always return to the core of the prosecutorial misconduct standard, the "overall fairness of the entire trial." *Noakes*, 354 S.W.3d at 121. Here, while three of the four factors favor Cotton, the strength of the evidence against him leads us to hold that the impermissible opening statement did not "so seriously [affect] the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Barrett v. Commonwealth*, 677 S.W.3d 326, 336 (Ky. 2023) (quoting *Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009)). The Commonwealth's statements were unnecessary and undeniably outside the purview of proper argumentation, and, if repeated, will inevitably lead to reversal in some future case. But today, the specific context of the case against Cotton does not call for that result. The Commonwealth's unforced error is saved by the quality of the police work that built the case against Cotton.

Although the Commonwealth's opening is the most egregious allegation of prosecutorial misconduct Cotton makes, it is not the only allegation. Cotton also alleges misconduct for comments related to Cotton's invocation of his right to remain silent and comments on Cotton's co-defendants' decision to resolve their cases. As to the references to *Miranda*, Cotton alleges two instances, although our review of the case reveals only one instance of the prosecutor

25

specifically mentioning Cotton's invocation.[4]  As noted above, "In general, '[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody.'" *Manning*, 701 S.W.3d at 508 (quoting *Hunt*, 304 S.W.3d at 35).  But if the comment was minor and not dwelled upon, we have not found reversible error.  *Manning*, 701 S.W.3d at 508-09.  Unlike the instance with Det. Stucki, this reference to *Miranda* is more offensive because the prosecutor specifically asked about Cotton's invocation.  But, after Det. Stucki's short response of "yes," the prosecutor moved on.  The question was error, but not flagrant.  The question and response were prejudicial and deliberate, but were not extensive, and, as already set forth, the strength of the evidence against Cotton was strong.  The analysis weighs more strongly for the Commonwealth than with the opening statement.  Since we declined to reverse for the improper opening, we will not do so here.

Finally, we address the prosecutor's references to Cotton's co-defendants' resolutions of their own cases.  Generally, "[i]t has long been the rule in this Commonwealth that it is improper to show that a co-indictee has already been convicted under the indictment." *Parido v. Commonwealth*, 547 S.W.2d 125, 127 (Ky. 1977) (quoting *Martin v. Commonwealth*, 477 S.W.2d 506, 508 (Ky. 1972)).  But the core issue we have found with such testimony is not its mention per se, but rather its use as substantive evidence against the

---

[4] The other instance comes from the testimony of Det. Stucki in response to a general question about the investigation.  That comment is addressed in part II, *supra.*

26

defendant on trial. *See Tipton v. Commonwealth*, 640 S.W.2d 818, 820 (Ky. 1982) ("To make such a reference and to blatantly use the conviction as substantive evidence of guilt of the indictee now on trial is improper regardless of whether the guilt has been established by plea or verdict, whether the indictee does or does not testify, and whether or not his testimony implicates the defendant on trial."). Here, discussion of the co-defendants' cases was not a blatant attempt to use their guilt as evidence of Cotton's guilt. Rather, discussing them served to fill in a hole highlighted by Cotton at trial, namely, where were the other two individuals involved in the shooting? Cotton made this a central theme in his closing and when the Commonwealth spoke in response, they answered that question by explaining the co-defendants had resolved their cases. What resolution they reached is ambiguous, the jury only knew they were not at trial because they did not need to be. In this context, we do not believe the Commonwealth ran afoul of the proscription identified in *Parido* because the comments did not go to the substantive question of Cotton's guilt. *Cf. Manning*, 701 S.W.3d at 503-04 (holding comments about a co-defendant's guilty plea were not error when they were made to impeach co-defendant). Accordingly, the comments were not error.

To summarize, although Cotton was correct in alleging error in two of his three claims, we hold none of the errors amounted to flagrant prosecutorial misconduct. But we cannot ignore that the Commonwealth was playing fast and loose with our rules during this trial and would do well to reign in their commentary in the future. As we have said,

27

> Prosecutors have a special role in the judicial system. Unlike other attorneys, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." See Model Rules of Prof'l Conduct R. 3.8 cmt. 1. The sovereign, represented in a criminal trial by the prosecutor, has an interest "not that it shall win a case, but that justice shall be done."
>
> Commonwealth Attorneys should not rely on the hope that known errors they make will not be considered palpable on appeal but should instead engage in best practices.

*Stephens v. Commonwealth*, 680 S.W.3d 887, 911 (Ky. 2023) (quoting *Caudill v. Commonwealth*, 374 S.W.3d 301, 309 (Ky. 2012)).  Our holding today rests largely on the specific circumstances presented to us.  Where the evidence is weaker, similar comments may not survive the searching review of the appellate process.  But today, we will not reverse Cotton's case on this basis.

**V.    The trial court erred in failing to consider probation at sentencing.**

The penultimate issue we address is whether the trial court erred in indicating in its final judgment that Cotton was "ineligible for probation. . . because of the applicability of KRS[5] 532.080, KRS 439.4301, or KRS 533.060."  Cotton argues that in doing so, the trial court violated *Thomas v. Commonwealth* and mistakenly applied statutes only applicable to adult offenders to a minor.  The Commonwealth contends that the box checked on the final judgment form was simply a clerical error and that the trial court did indeed consider probation and elected not to impose it.[6]  Because the record

---

[5] Kentucky Revised Statutes.

[6] The Commonwealth also suggests it takes issue with Cotton raising the issue for the first time on appeal, but this question is squarely resolved by *Thomas*: "even though Thomas himself failed to raise the issue of probation eligibility before the trial

provides no indication the incorrect box was marked or that probation was considered, we vacate and remand for resentencing.

The legal basis underlying this appeal is presented to us almost exactly as it was in *Thomas*—indeed, both *Thomas* and this case arise from a final judgment entered by the same trial judge. In *Thomas*, Layw Thomas pled guilty to a variety of violent crimes committed when he was 17 years old. In its final judgment, the trial court marked the box indicating Thomas was "not eligible for probation" and did not state for the record its reason for finding Thomas ineligible.

We held, "the trial court erred by failing to follow the directives of Kentucky's Juvenile Code by imposing a sentence of imprisonment in violation of KRS 533.010, which requires consideration of probation, conditional discharge, or an alternative sentence before imposing imprisonment." *Thomas* 605 S.W.3d at 560-61. Our analysis is pertinent here:

> KRS 533.010(1) provides that "[a]ny person who has been convicted of a crime and who has not been sentenced to death may be sentenced to probation, probation with an alternative sentencing plan, or conditional discharge as provided in this chapter." KRS 533.010(2) provides that "[b]efore imposition of a sentence of imprisonment, the court shall consider probation, probation with an alternative sentencing plan, or conditional discharge. Unless the defendant is a violent felon as defined in KRS 439.3401 or a statute prohibits probation...." And KRS 533.060(1) provides, in part, that "[w]hen a person has been convicted of an offense or has entered a plea of guilty to an offense classified as a Class A, B, or C felony and the commission of the offense involved the use of a weapon from which a shot or projectile may be discharged that is readily capable of producing death or other

---

court, sentencing issues may be raised for the first time on appeal." *Thomas*, 605 S.W.3d at 561.

29

serious physical injury, the person shall not be eligible for probation...."

These statutes establish that a trial court must consider probation for an adult defendant before imposing a sentence of imprisonment unless: (1) the defendant has been sentenced to death; (2) the crime of which the defendant stands convicted falls within one of the categories outlined in KRS 533.060; or (3) the defendant is considered a violent offender as defined in KRS 439.3401. But this standard is different when the defendant being sentenced committed the underlying crimes before he or she reached the age of majority and was transferred to circuit court to be prosecuted as a youthful offender.

The crimes for which Thomas entered pleas would certainly render him ineligible for probation consideration by operation of either KRS 533.060(1) or KRS 533.010(2) if the crimes had been committed after he reached the age of majority. But, as the parties agree, even though Thomas was transferred to the circuit court to be tried as an adult under KRS 635.020, he was still entitled to the protections provided for youthful offenders under Kentucky's Juvenile Code. With respect to KRS 533.060, Kentucky's Juvenile Code explicitly states that the probation limitations contained in KRS 533.060(1) are inapplicable to youthful offenders like Thomas. With respect to KRS 533.010(2), while none of the provisions of Kentucky's Juvenile Code explicitly states that KRS 533.010(2) is inapplicable to youthful offenders, based on our holdings in *Commonwealth v. Merriman*,[7] *Buckner v. Commonwealth*,[8] and *Edwards v. Harrod*,[9] it is perhaps unclear whether the statute is applicable to youthful offenders who are sentenced after they reach age eighteen.

. . . [T]hese cases did not decide the precise issue now before us: whether the probation limitation for violent offenders contained in KRS 533.010(2) applies to youthful offenders sentenced after they reach the age of majority? As explained below, we now hold, consistent with our holdings in *Merriman, Buckner*, and *Edwards*, that considering "statutory interpretation, logic, and belief in the good sense of the legislature," the violent offender statute is not

---

[7] 265 S.W.3d 196, 198–201 (Ky. 2008).

[8] No. 2006-SC-000479-MR, 2008 WL 5051578 (Ky. Nov. 26, 2008).

[9] 391 S.W.3d 755, 760–62 (Ky. 2013).

applicable to youthful offenders who are convicted or sentenced after they reach the age of majority.

. . . .

There are other subsections of KRS 640.030, as well as other provisions of KRS Chapter 640 that were not relevant in *Merriman* that indicate that the legislature intended for probation to be available as a sentencing option for youthful offenders, even when such offenders qualify as a violent offender and are sentenced after they reach the age of majority. Again, under KRS 640.030(2), when a youthful offender reaches the age of majority and is returned to the trial court for resentencing, "the length and all other conditions of the Youthful Offender's sentence remain the same **except for whatever statutory determinations the trial court makes at that review**." The "determinations" available for youthful offenders who reach the age of majority are "to place the Youthful Offender on probation or conditional discharge, incarcerate him in adult prison, or return him to the Department of Juvenile Justice to complete a treatment program of up to five months." KRS 630.030(3) provides that those youthful offenders who have "attained the age of eighteen (18) years but less than eighteen (18) years and five (5) months prior to sentencing" shall also be returned for resentencing when they are eighteen years and five months old, and the trial court is again directed to make the same "determinations," including whether the defendant is a good candidate for probation.

Also, KRS 640.075(1) provides that youthful offenders who were committed to the Department of Corrections under KRS 640.030(2)(c) may, until age twenty-one, remain in the custody of the Department of Juvenile Justice under some circumstances. KRS 640.075(4) then provides that the "youthful offender whose custody has been retained under subsection (1) of this section ... may, on one (1) occasion and after the completion of a minimum twelve (12) months additional service of sentence, petition the sentencing Circuit Court for reconsideration of probation and, except as provided in KRS 439.3401, may be considered for early parole eligibility."

. . . .

[T]oday we merely hold that trial courts must consider probation for youthful offenders who also qualify as violent offenders before committing them to the Department of Corrections. This Court's current holding does not undermine the trial court's ample

31

> discretion to hold youthful offenders fully accountable for their actions but simply provides for an additional avenue for rehabilitating delinquent youth.

*Thomas*, 605 S.W.3d at 561-66.

The record in this case is on all fours with that in *Thomas*. No party disputes that Cotton was transferred to the circuit court as a youthful offender pursuant to KRS 635.020. The only reference to probation in the record, either written or video recorded, is the checked box indicating that the trial court found Cotton to be ineligible for probation. We are given no indication why or how the trial court came to this conclusion. Perhaps the Commonwealth is correct that the trial court considered the victim impact statements in the context of probation and the box checking was done in error, but the silence of the record is deafening. As in *Thomas*, the trial court marked Cotton as ineligible for probation when it was statutorily obligated to consider probation and the record provides no indication that probation was ever contemplated as a sentencing option.[10] And so, as in *Thomas*, we hold the trial court erred in neglecting to do so. Accordingly, we vacate the judgment against Cotton and remand for resentencing to give the trial court the opportunity to consider probating Cotton's sentence.

---

[10] Cotton's failure to seek probation at sentencing did not obviate the trial court's responsibility to consider it for youthful offenders. *Thomas*, 605 S.W.3d at 561.

32

## VI.    No cumulative error occurred.

Finally, Cotton argues that even if no single error suffices to reverse his conviction, then the cumulative effect of those errors should do so. "[C]umulative error, the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown*, 313 S.W.3d at 631.

> We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. Where. . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice.

*Id.* (internal citations omitted).

This court has reversed convictions for cumulative error only in exceedingly rare circumstances. Indeed, our research reveals only two published cases where the doctrine has been successfully argued: *Funk v. Commonwealth*, 842 S.W.2d 476, 483 (Ky.1992) and *Peters v. Commonwealth*, 477 S.W.2d 154, 157 (Ky.1972). *Funk* is not particularly instructive on the question of when application of the doctrine is appropriate, because that case was not reversed on the basis of cumulative error; rather, the Court found three individual instances of reversible error, but nonetheless opined in dicta "that if each of these errors were not, in and of itself, sufficient to require a reversal, the cumulative effect of the prejudice from all three would certainly so require." *Funk*, 842 S.W.3d at 483. Our current approach to the cumulative error doctrine would have prevented us from addressing the issue, *see, e.g.*, *Brafman*, 612 S.W.3d at 870 ("There are multiple errors in this case, but the

33

prosecutorial misconduct was enough to warrant reversal. Therefore, we have no reason to determine whether the cumulative effect of the other errors would require reversal."), but *Funk* did so and has become a common citation for our cumulative error analyses. *See, e.g., Brown*, 313 S.W.3d at 631 (citing *Funk* for the principal that "[w]e have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial.")[11]

*Peters* is only slightly more instructive. Although the case apparently predates our current nomenclature for cumulative error, the Court's concept of the doctrine was the same. In *Peters*, Jesse Peters was sentenced to death for the murder of his mother. On appeal, we reversed his sentence of death because of improper voir dire procedures before addressing defects in the guilt-phase of the trial. *Peters*, 477 S.W.2d at 157 (reversing based on the U.S. Supreme Court decision in *Jaggers v. Kentucky*, 403 U.S. 946 (1971)). The Court then addressed a large number of trial errors in cursory fashion without finding any of them individually sufficient to merit reversal. However, we reversed Peters's conviction because "a number of trial errors were made, neither of which taken alone would have justified a reversal; but the accumulation of these errors inclines this court to also reverse the conviction with directions to grant appellant a full, new trial." *Id.* at 158. Of course, the brief nature with which our predecessor court treated the trial errors leaves a great many questions as to the severity of those errors; certainly the

---

[11] *Brown*'s cumulative error analysis has been cited in 137 opinions, not including this one

descriptions we are given do not paint the picture of errors "bordering, at least, on the prejudicial."

All of this is to say that our jurisprudence affords very little guidance as to when cumulative error justifies reversal. Our review of the cases reiterates that the errors must be significant, although ultimately non-prejudicial by the specific circumstances of the case, as the well-worn words of *Brown* attest. But the doctrine of cumulative error by its very nature also suggests that we must find more than one nearly-prejudicial error. To rephrase another well-worn adage regarding cumulative error, we decline to hold that a single borderline error plus other minor errors adds up to prejudice. That is the case here.

The prosecutor's misstep in her opening was a significant error, deemed nonprejudicial because of the strength of the evidence against Cotton. The most serious of the other errors we identified, the prosecutor's reference to *Miranda,* was not bordering on the prejudicial. The remainder did not nearly approach the level of severity needed to justify reversal. In Cotton's case, one serious error without others of similar severity does not justify reversal under the cumulative error doctrine.

## CONCLUSION

For the foregoing reasons, we affirm Cotton's conviction for murder, but reverse Cotton's sentence and remand for proceedings consistent with this opinion.

All sitting. All concur.

35

COUNSEL FOR APPELLANT:

Robert C. Yang
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General